IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-_____

ASSOCIATION OF HOME APPLIANCE MANUFACTURERS,

        Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado
Department of Public Health & Environment (CDPHE), in her
official capacity;

JEFF LAWRENCE, Director of the Environmental Health and
Sustainability Division of the CDPHE, in his official capacity; and

PHIL WEISER, Colorado Attorney General, in his official capacity.

        Defendants.

---

## EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 7

A.    THE ASSOCIATION OF HOME APPLIANCE MANUFACTURERS .......................... 7

B.    GAS STOVES INSTALLED AND OPERATED PROPERLY POSE NO
      GREATER HEALTH RISKS THAN ELECTRIC RANGES ............................................ 8

C.    THE MORE RECENT DEBATE CONCERNING DECARBONIZATION, AND
      EFFORTS TO USE CONSUMER HEALTH ARGUMENTS TO FURTHER
      DECARBONIZATION GOALS ..................................................................................... 14

D.    UNITED STATES REGULATORS AND LEGISLATORS CONCLUDE GAS
      STOVES SHOULD NOT BE SINGLED OUT FOR REGULATION ........................... 16

E.    HB25-1161 PASSED WITHOUT ROBUST SCIENTIFIC DEBATE BUT
      CONSISTENT CLIMATE ATTENTION ....................................................................... 17

F.    AHAM SOUGHT FURTHER ENGAGEMENT with THE STATE TO AVERT
      THE BILL'S IMPLEMENTATION, BUT THE STATE PUBLISHED the
      WEBSITE TWO DAYS BEFORE THE LAW'S EFFECTIVE DATE,
      WITHOUT ANY STAKEHOLDER INPUT ................................................................... 23

LEGAL STANDARD ......................................................................................................... 26

ARGUMENT ..................................................................................................................... 27

I.    AHAM IS LIKELY TO SUCCEED ON ITS FIRST AMENDMENT
      CLAIM ................................................................................................................. 30

      A.    HB25-1161, in Contrast to True Consumer Warning Laws,
            Compels Retailers, Including Manufacturers Who Engage in
            Online Sales, to Participate in an Ongoing Debate Unrelated to
            Consumer Health and Must Therefore Be Subjected to Strict
            Scrutiny. ................................................................................................... 30

      B.    The State Cannot Sustain Its Burden of Establishing That HB25-
            1161 Is Narrowly Tailored to Promote a Compelling State Interest. ....... 35

i

C.    The State Cannot Escape Strict Scrutiny, Because Neither of the Narrow Exceptions to Strict Scrutiny for Commercial Speech Apply to HB25-1161..................................................................... 39

D.    Even if HB25-1161 Were a Commercial Speech Regulation, it Could Not Withstand Intermediate Scrutiny under *Central Hudson* or the Standards of *Zauderer*. .................................................. 47

II.    THE REMAINING FACTORS SUPPORT A TRO AND PRELIMINARY INJUNCTION. .......................................................... 49

CONCLUSION......................................................................................................... 51

CERTIFICATION PURSUANT TO LOCAL RULES 7.1(a) AND 65.1(a) .............................. 52

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*ACLU of Illinois v. Alvarez,*
 679 F.3d 583 (7th Cir. 2012) ................................................. 50

*All. of Health Care Sharing Ministries v. Conway,*
 No. 24-CV-01386-GPG-STV, 2025 WL 315389
 (D. Colo. Jan. 13, 2025) ....................................................... 40

*Ashcroft v. American Civil Liberties Union,*
 535 U.S. 564 (2002) ............................................................. 32

*Awad v. Ziriax,*
 670 F.3d 1111 (10th Cir. 2012) .............................. 36, 37, 50

*Bd. of Trs. of State Univ. of New York v. Fox,*
 492 U.S. 469 (1989) ............................................................. 40

*Bolger v. Youngs Drug Prods. Corp.,*
 463 U.S. 60 (1983) ....................................................... 40, 47

*Brown v. Ent. Merchants Ass'n,*
 564 U.S. 786 (2011) ..................................................... 37, 47

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
 29 F.4th 468 (9th Cir. 2022) ................................................. 45

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
 95 F.3d 959 (10th Cir. 1996) ............................................... 40

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
 447 U.S. 557 (1980) ..................................................... passim

*Church on the Rock v. City of Albuquerque,*
 84 F.3d 1273 (10th Cir. 1996) ............................... 33, 34, 36

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
 596 U.S. 61 (2022) ............................................................... 35

*City of Boerne v. Flores,*
 521 U.S. 507 (1997) ............................................................. 35

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) .................................................................................... 40

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 530 (1980) .................................................................................... 36

*CTIA—The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ............................................................... 43, 46

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
  263 F.3d 1297 (11th Cir. 2001) ................................................................. 51

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ............................................................................. 47, 48

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................... 50

*Evans v. Sandy City*,
  944 F.3d 847 (10th Cir. 2019) ................................................................... 38

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) .................................................................................... 39

*Free Speech Coal., Inc. v. Paxton*,
  145 S. Ct. 2291 (2025) ................................................................. 35, 45, 48

*Glickman v. Wileman Bros. & Elliott, Inc.*,
  521 U.S. 457 (1997) ............................................................................. 40, 42

*Greater Phila. Chamber of Com. v. City of Phila.*,
  949 F.3d 116 (3d Cir. 2020) ...................................................................... 35

*Hedrick v. BSH Home Appliances Corp.*,
  No. 2:23-CV-04752-JWH-JDE, 2025 WL 1238363
  (C.D. Cal. Apr. 28, 2025) ............................................................... 3, 28, 46

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ................................................................. 27

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ................................................................. 50

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ....................................................................................... 35

*Int'l Outdoor, Inc. v. City of Troy*,
    974 F.3d 690 (6th Cir. 2020) ............................................................ 34

*Johanns v. Livestock Mktg. Ass'n*,
    544 U.S. 550 (2005)........................................................................ 40

*Junior Sports Mags. Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) .......................................................... 47

*McCullen v. Coakley*,
    573 U.S. 464 (2014)........................................................................ 38

*Members of the City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)........................................................................ 33

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010)................................................................ 39, 42

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ................................................. passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018)............................................................ 43, 48, 49

*Nellson v. Barnhart*,
    454 F. Supp. 3d 1087 (D. Colo. 2020) ............................................. 26

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................ 27

*Ortega v. Lujan Grisham*,
    741 F. Supp. 3d 1027 (D.N.M. 2024) ............................................... 26

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ......................................................... 33

*Pharmanex, Inc. v. HPF*,
    221 F.3d 1352 (10th Cir. 2000) ....................................................... 27

*Pryor v. Sch. Dist. No. 1*,
    99 F.4th 1243 (10th Cir. 2024) ........................................................ 50

*R J Reynolds Tobacco Co. v. Food & Drug Admin.*,
    96 F.4th 863 (5th Cir. 2024) ................................................ 42, 44, 45

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ..................................................................................... 35

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................... 29, 33

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002) ............................................................................... 35, 37

*Riley v. Nat'l Fed. of the Blind*,
  487 U.S. 781 (1988) ...................................................................................... 2

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ..................................................................... 27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ........................................................................... 30, 33, 38

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ................................................................................. 29, 32

*SCO Grp., Inc. v. Novell, Inc.*,
  692 F. Supp. 2d 1287 (D. Utah 2010) ......................................................... 41

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ..................................................................................... 34

*Summum v. Callaghan*,
  130 F.3d 906 (10th Cir. 1997) ..................................................................... 35

*Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*,
  23 F.4th 1262 (10th Cir. 2022) .................................................................... 50

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ..................................................................................... 39

*U.S. West, Inc. v. F.C.C.*,
  182 F.3d 1224 (10th Cir. 1999) ............................................................... 47, 48

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001) ............................................................................... 40, 42

*United States v. Wenger*,
  427 F.3d 840 (10th Cir. 2005) ................................................................ 40, 43

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981).................................................................................................. 27

*Vidal v. Elster*,
    602 U.S. 286 (2024).................................................................................................. 32

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).................................................................................................. 38

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002).................................................................................................. 36

*Wiechmann v. Ritter*,
    44 F. App'x 346 (10th Cir. 2002)............................................................................. 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................... 27

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024).................................................................................. 50

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
    471 U.S. 626 (1985)........................................................................................... passim

**STATUTES**

Colo. Rev. Stat. § 6-1-110 ............................................................................................ 24

Colo. Rev. Stat. § 6-1-112b .......................................................................................... 24

Colo. Rev. Stat. § 6-1-113 ............................................................................................ 24

**RULES**

Fed. R. Civ. P. 65 .......................................................................................................... 22

## INTRODUCTION

The Association of Home Appliance Manufacturers ("AHAM"), whose members include manufacturers of gas and electric stoves and other consumer appliances, has for decades been a leader in the development of science-driven, consensus standards through collaboration with government regulators, independent standards organizations, home appliance manufacturers, and experts across a range of fields. One of AHAM's key missions is to help members deliver safer, more efficient, and innovative products to improve Americans' lives.

AHAM brings this emergency motion for temporary restraining order and preliminary injunction to protect its members' First Amendment rights to be free from the unconstitutional compelled speech mandated by Colorado House Bill 25-1161 ("HB25-1161") and to protect Colorado consumers from receiving misleading and inaccurate information about their products. Effective August 6, 2025, HB25-1161 requires AHAM's members to disseminate and endorse a prominent warning label—at the point of sale for every gas stove sold to Colorado consumers in stores and online—that directs consumers to a non-consensus, scientifically controversial, and factually misleading government-mandated message about the purported "**Health Risks from Indoor Air Pollution Associated with Gas Stoves**," which is contrary to the view of the World Health Organization, the U.S. Government Accountability Office, and federal agencies responsible for ensuring the health and safety of American consumers. If AHAM's members do not disseminate that message, HB25-1161 exposes them to harsh penalties—it deems them to have engaged in a "deceptive trade practice," allowing either the State itself or private parties to impose damages, including on a class-action basis; penalties of up to $20,000 per violation; injunctions; and fee-shifting awards.

The content of this message—displayed on a state-created website that was developed without any stakeholder input and no opportunity for comment—was released only yesterday, on August 4, 2025. AHAM and other stakeholders have made requests to the State to delay enforcement of HB25-1161, including today, after the State finally made the misleading website content publicly available and confirmed the severe constitutional violations inherent in HB25-1161. The State has refused those requests, forcing a scramble to immediately comply with the law just 48 hours after the State publicized the content of the message it seeks to force AHAM's members to convey, on threat of potentially severe legal sanctions.

The suggestion that gas stoves, and only gas stoves, pose health risks represents a vanishing minority view in the scientific literature. The overwhelming majority of available health research shows there is no *association* between gas stoves and adverse health outcomes, and—most critically—when evaluated collectively, fails to demonstrate *causation*. Indeed, the vast majority of studies concerning health outcomes relative to cooking fuel conclude that *the potential health risks of cooking with gas are no different than cooking with electricity*. As Dr. Stacey Benson, an independent epidemiologist specializing in environmental epidemiology, has testified in a declaration accompanying this motion, "*To suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate*." (Benson Decl. ¶ 10.) Yet HB25-1161 singles out gas stoves, and requires only gas stoves, to carry a one-sided, misleading, and stigmatizing message at the point of sale. HB25-1161 thus "[m]andat[es] speech that [AHAM's members] would not otherwise make[,] necessarily alter[ing] the content of the[ir] speech." *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 795 (1988).

2

Because there is scant scientific support—far from scientific consensus—for HB25-1161's compelled disclosure of the purported "health risks" or "health impacts" of gas stoves, the disclosure cannot withstand constitutional scrutiny. The First Amendment prohibits compelled disclosures unless they are "purely factual and uncontroversial." Courts have universally held that disclosures that are not rooted in scientific consensus necessarily are neither purely factual nor uncontroversial. Applying that rule to the science surrounding gas stoves, a District Judge in the Central District of California recently found that "there is no scientific consensus regarding" the purported "health risks" of using gas stoves, and, thus, forcing manufacturers to place a warning label on gas stoves "would be barred by the First Amendment." *Hedrick v. BSH Home Appliances Corp.*, No. 2:23-CV-04752-JWH-JDE, 2025 WL 1238363, at *6 (C.D. Cal. Apr. 28, 2025) (dismissing consumer class action seeking to impose liability on manufacturers based on their failure to provide consumers a warning similar to that required by HB25-1161).

Even more problematic, the legislative record shows that HB25-1161 was not driven by purported "health impacts" unique to gas stoves, but instead by the unrelated public policy debate on climate change and decarbonization. As one of the legislative sponsors of HB25-1161 testified, "gas appliances contribute to climate change and must be part of the conversation as we look to combat that existential crisis."[1] This echoes prominent literature in the decarbonization debate: "health hazards of indoor combustion can offer an essential antidote to the gas industry's climate obstruction strategies, while the climate implications of gas stoves can provide

---

[1] Duero Decl. Ex. A at 5:14-17.

motivation for state and local governments to take action on indoor air pollution."[2] Even

literature cited on the just-released state-run website confirms: "natural gas use in buildings and

homes … is being targeted for a reason wholly unrelated to indoor air quality: It is a fossil fuel."[3]

Thus, not only is HB25-1161 scientifically unsupported, it is also a government regulation of

speech that is both content- and viewpoint-based. That makes the law a clear violation of the

First Amendment rights of AHAM's members that cannot be justified under any relevant

constitutional standard. For these reasons, AHAM is highly-likely to succeed on the merits of

this action.

From the time HB25-1161 was introduced, AHAM actively engaged with legislators,

alerting them that the science does not support that gas stoves cause any negative health impacts

nor are worse for health than electric stoves. AHAM contacted every legislator and testified

before the House and Senate committees considering HB25-1161 with oral and written remarks.

(Cassady Decl. ¶¶ 6-17.) After HB25-1161 was signed, AHAM contacted the Governor's office

with two letters and multiple requests to meet to discuss its concerns, including to alert the

Governor that a federal judge had recently ruled that requiring similar warnings about gas stove

emissions would violate the First Amendment. (*Id*. Ex. H & I.) After Governor Polis signed

HB25-1161 on June 4, 2025, AHAM continued to meet with its members and other stakeholders,

including the Colorado Retail Council, to discuss the implications of the legislation and its

---

[2] Aaron Regunberg, *Taking on "Now We're Cooking With Gas": How a Health-First Approach to Gas Stove Pollution Could Unlock Building Electrification*, Harv. Envtl. L. Rev. (August 29, 2022), Duero Decl. Ex. B.

[3] Nate Seltenrich, *Clearing the Air: Gas Stove Emissions and Direct Health Effects*, Envtl. Health Perspectives 132(2):022001-02 (February 28, 2024), Duero Decl. Ex C at 2 (cited on CDPHE website, Cassady Decl. O, at Bibliography n.5.)

implementation. On June 23, 2025, the Colorado Retail Council contacted the Colorado Department of Public Health and Environment ("CDPHE") to request information about the status of the proposed webpage and, on July 1, 2025, the Colorado Retail Council and other stakeholders requested a 180-day delay on enforcement of HB25-1161. (Cassady Decl. ¶¶ 18-20.) CDPHE did not grant that request or even respond to it. On July 9, 2025, AHAM emailed CDPHE to request an update on the website content, but received no reply. (*Id.* ¶ 19.) On July 30, 2025, AHAM again contacted the CDPHE and the Attorney General to raise their concerns, to request a stay of enforcement of HB25-1161, and to alert the State that AHAM had retained counsel to initiate litigation to protect the First Amendment rights of their members. (*Id.* ¶ 21.) AHAM did not receive a response until after 5:00 p.m. on Friday August 1, 2025, which stated only that "someone from [the Attorney General's] office will be in touch . . . on Monday[,]" August 4, 2025. (*Id.* ¶ 22.)

That day, August 4, 2025, CDPHE published the website about the purported health impacts of gas-fueled stoves required by C.R.S. Section 25-5-1602(4), (*id.* ¶ 23), with no opportunity for public comment or stakeholder input. The website is titled "Credible, Evidence-Based Information on the Health Impacts of Gas-Fueled Stoves" and lists several serious and potentially fatal adverse health conditions—such as "chronic heart and lung diseases," "asthma," and "some cancers, such as leukemia"—under the heading "Health Impacts from Indoor Air Pollution Associated with Gas Stoves." (Cassady Decl., Ex O.) Yet it *presents only minority views of the available scientific literature*. Although the overwhelming majority of epidemiological studies assessing whether there is any statistically-significant association between gas stoves and adverse health effects have found *none*, the website fails to cite, or even

acknowledge, these studies. The website attempts to bolster its biased claims by stating that "the department also compared this content to the information provided by other state governments for consistency." (*Id*.) Tellingly, however, *none* of those other state governments mandate gas stove retailers and manufacturers *themselves* to disseminate this one-sided, misleading information to every consumer considering to purchase their products, as HB25-1161 does. Given these obvious First Amendment violations, AHAM asked representatives of the Attorney General's office today to stay enforcement of law, which they declined to do. AHAM thus had no choice but to bring this motion for temporary restraining order and preliminary injunction to stop enforcement of this unconstitutional law.

AHAM fully supports the continued development of consensus standards and innovations to make products more energy efficient, further reducing carbon emissions overall. And AHAM supports science-driven measures to protect consumer health—including universal ventilation standards for all stoves, not just gas-fueled stoves. But AHAM cannot support this unconstitutional viewpoint-based speech compulsion, and brings this suit to give HB25-1161 the strict scrutiny it deserves and permanently enjoin the First Amendment violation HB25-1161 imposes on AHAM's members.

Absent an injunction now, AHAM's members will suffer irreparable harm by being compelled to promote the State's message in an ongoing policy debate—a message that can be changed or expanded to include new content without notice—in a way that denigrates and stigmatizes their own products. And the public interest would surely be served by protecting AHAM's members' First Amendment rights while preventing scientifically unsupported, one-sided views from misleading consumers about their purchase decisions. Accordingly, AHAM

respectfully requests that the Court grant its motion to preliminarily enjoin HB25-1161 pending resolution of AHAM's claim on the merits.

## BACKGROUND

### A.    THE ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

AHAM is the leading trade association of home appliance manufacturers in the United States and Canada. AHAM represents more than 160 member companies that manufacture 90% of the major, portable, and floor care appliances shipped for sale in the U.S. (Cassady Decl. ¶ 2.) AHAM's membership includes several manufacturers of gas and electric cooking products, including all the major household names with which Americans are familiar. (*Id*. ¶ 3.) The home appliance industry is a significant segment of the U.S. economy, measured by the contributions of home appliance manufacturers, wholesalers, and retailers. In all, the industry drives hundreds of billions in economic output throughout the U.S. (*Id*. ¶ 4.) In Colorado, the home appliance industry is a significant and critical segment of the economy, contributing 12,000 jobs and hundreds of millions in tax revenue. (*Id*..)

Home appliances are the heart of the home, and AHAM helps its members provide safe, innovative, sustainable and efficient products that enhance Americans' lives. One of AHAM's major areas of focus is the collaborative process among government regulators, independent standards organizations, and home appliance manufacturers, together with experts across a range of fields, to develop science-backed consensus standards to improve the safety and efficiency of home appliances and to foster innovation in achieving these goals. (Cooper Decl. ¶ 2.) AHAM actively works with the American Society of Heating, Refrigeration, and Air-Conditioning Engineers ("ASHRAE"), the United States Consumer Product Safety Commission ("CPSC"),

Health Canada and the Canadian Standards Association ("CSA"), and other stakeholders to develop standards to further improve indoor air quality, including ventilation and emissions standards to reduce indoor emissions from cooking and other sources in new construction and future appliance designs. (*Id*. ¶¶ 4-15.) This work is forward-looking with the goal of improving indoor air quality and consumer experience, and is not in response to any immediate health hazards posed by gas stoves. (*Id.* ¶ 15.)

## B.    GAS STOVES INSTALLED AND OPERATED PROPERLY POSE NO GREATER HEALTH RISKS THAN ELECTRIC RANGES

Based on established scientific principles, there is no scientific consensus that using gas stoves for home cooking is associated with or causes any health impacts or effects. (Benson Decl. ¶¶ 11–13.) Indeed, "[t]o suggest there is scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate." (*Id.* ¶ 10.) Studies overwhelmingly find no association between gas stoves and adverse health endpoints. (*Id*. ¶¶ 59, 67.)

For example, in 2024, a group of international researchers published an article in the highly respected *Lancet Journal of Respiratory Medicine*. Funded by the (non-partisan) World Health Organization ("WHO"), researchers analyzed 116 studies to summarize the health impacts, if any, associated with or caused by cooking or heating with gas, compared with "polluting fuels" or with clean energy.[4] They found **no significant associations** between cooking

---

[4] Puzzolo, E., N. Fleeman, F. Lorenzetti, F. Rubinstein, Y. Li, R. Xing, G. Shen, E. Nix, M. Maden, R. Bresnahan, R. Duarte, L. Abebe, J. Lewis, K. N. Williams, H. Adahir-Rohani and D. Pope (2024). "Estimated health effects from domestic use of gaseous fuels for cooking and heating in high-income, middle-income, and low-income countries: a systematic review and meta-analyses." Lancet Respir Med 12(4): 281-293; Benson Decl. ¶ 89 & Ex. D.

with gas and adult asthma, wheeze, cough, or breathlessness—even when compared with
cooking with electricity. (Benson Decl. ¶¶ 54, 89 & Ex. D) And, when compared with "polluting
fuels," like wood or charcoal, cooking with gas "significantly *lowered* the risk of pneumonia,
wheeze, cough, breathlessness, chronic obstructive pulmonary disease, bronchitis, pulmonary
function deficit, severe respiratory illness or death, and low birth weight." (*Id.*) Remarkably,
despite the WHO's independence and standing in the international community, the State's
website does not cite this recent, comprehensive study. (Cassady Decl., Ex. O.)

The results of the 2024 WHO article accord with numerous previously published papers,
including:

- A 2013 analysis, also in the *Lancet Journal on Respiratory Medicine*, finding that
  data from over 500,000 primary and secondary school children across 47 countries
  found "no evidence of an association between the use of gas as a cooking fuel and
  either asthma symptoms or asthma diagnosis."[5]

- A 2014 report, published by the WHO, finding that "evidence for a relationship
  between gas cooking (and indoor NO2) and asthma prevalence or asthma symptoms
  was *inconsistent*" and that "the current evidence was *insufficient to support
  causality*."[6]

- A 2023 review, in the journal *Global Epidemiology*, concluding that the current
  epidemiology literature does *not* "provide sufficient evidence regarding causal
  relationships between gas cooking or indoor NO2 and asthma or wheeze."[7]

---

[5] Gary Wong et. al., Cooking fuels and prevalence of asthma: a global analysis of phase
three of the International Study of Asthma and Allergies in Childhood (ISAAC), 1 Lancet
Respir. Med., 386 (May 31, 2013); Benson Decl. ¶ 8 & Ex. G.

[6] Nigel Bruce et. al., WHO Indoor Air Quality Guidelines: Household Fuel Combustion
Review 4: health effects of household air pollution (HAP) exposure, at 74 (2014) (emphasis
added); Duero Decl., Ex. J.

[7] Li et. al, Gas cooking and respiratory outcomes in children: A systematic review, 5
*Global Epidemiology* 100107 (2023); Benson Decl. ¶ 89 & Ex. C.

These scientific studies align with the approach adopted by the United States government. The Government Accountability Office most recently recognized in 2025 that there is "***no consensus on the health effects*** of nitrogen dioxide emissions directly attributable to gas stove cooking."[8] The Consumer Product Safety Commission clarified in 2023 and repeated in 2025 that it would not seek to "ban" gas stove use in the United States—indeed, it closed its investigation without taking any action at all.[9] And no other agency—including both the Department of Housing and Urban Development and the Environmental Protection Agency (EPA)—has determined that it is necessary to regulate gas emissions from indoor stoves.

In support of this motion, AHAM engaged Dr. Stacy Benson, an independent epidemiologist specializing in environmental epidemiology, occupational epidemiology, respiratory protection, and clinical research, and a former Fellow at the National Institute for Occupational Safety and Health in its National Personal Protective Technology Laboratory. (Benson Decl. ¶¶ 1, 3) Dr. Benson undertook a comprehensive survey of the available peer-reviewed epidemiological research evaluating cooking with natural gas and potential health endpoints. (*Id*. ¶ 23.) After identifying all systematic reviews and meta-analyses on this topic, *i.e.*, studies attempting to combine and appraise existing primary research, Dr. Benson then

---

[8] GAO Report at 3, https://www.gao.gov/assets/880/876258.pdf (emphasis added).

[9] *See* Feb. 26, 2025 Letter from Peter Feldman, Acting Chairman of CPSC to Alicia Kackley of GAO, at page 12 of GAO Report, https://www.gao.gov/assets/880/876258.pdf ("On March 7, 2023, the Commission published a Request for Information (RFI) on Chronic Hazards Associated with Gas Ranges. The comment period on this RFI closed in May 2023, and I consider this matter concluded. As GAO notes in its report, millions of Americans use gas stoves every day. . . . [A]s GAO also notes, there is ongoing disagreement about the extent of the linkage before the emissions produced by gas stoves and certain health issues. For these reasons, I believe CPSC's attention and limited resources are better focused on the agency's core safety mission, not backdoor climate regulation.").

evaluated the individual studies cited in those materials together with additional studies identified in her own independent search. (*Id*. ¶¶ 19, 23, 42–47.) Through this she identified a subset of 69 individual studies addressing respiratory symptoms and disease endpoints for wheeze, breathlessness, cough, chronic lung conditions, acute lower respiratory infections and pneumonia, and asthma. (*Id*. ¶ 58.) She also assessed studies addressing other potential health endpoints such as cardiovascular disease and cancer. (*Id*. ¶¶ 48–51.) She then assessed the collective body of this scientific evidence using the Bradford Hill Criteria. (*Id*. ¶¶ 30, 60–70.)

Application of the Bradford Hill Criteria is widely accepted in epidemiology as the fundamental method for establishing a causal inference. (*Id*. ¶¶ 25, 27.) The Bradford Hill Criteria cover a range of factors, including as relevant here: (1) strength of association, (2) consistency, (3) specificity, (4) temporality, and (5) dose response. (*Id*. ¶ 26.) No single factor is determinative. (*Id*. ¶ 27.) Applying the criteria here demonstrates that there is neither an association nor a causal inference between gas stove use and adverse health effects. (*Id*. ¶¶ 10–13, 70.)

**Strength of Association.** This factor assesses each quantified "effect estimate"—or strength of association between an exposure and an outcome—in each of the studies. (*Id*. ¶ 14.) The higher the effect estimate, the stronger the association. (*Id*. ¶) **The vast majority—over 80%—of the available effect estimates from the relevant studies failed to demonstrate a statistically significant association.** (*Id*. ¶¶ 60, 63.) And many of these effects estimates were from cross-sectional studies, which are of limited use because they cannot show that any observed health outcomes arose *after* exposure to gas stoves. (*Id*. ¶ 63.) Given this data, there is

no scientific consensus of any valid association between cooking with gas and health effects. (*Id.* ¶ 10.)

**Consistency.** In addition to the strength of an association, the consistency with which the association is shown across multiple studies is critical. Looking across all effect estimates for all endpoints in all studies, 80% of the studies fail to find any statistically-significant association with asthma, and fully 100% of the studies fail to find any with chronic obstructive pulmonary disease or bronchitis. (*Id.* ¶ 64.) Similarly, when comparing gas and electric fuel sources, 75% of the studies fail to find any statistically significant association with cough or acute lower respiratory infection (*e.g.*, pneumonia), and fully 100% fail to find any association with breathlessness, chronic obstructive pulmonary disease, or bronchitis. (*Id.*) **The small minority of studies finding associations across varied endpoints underscores the inconsistency among them and the absence of scientific consensus.** (*Id.* ¶ 64, 70.) These outcomes further demonstrate that the risk is no different than cooking with an electric appliance. (*Id.* ¶¶ 13, 64.)

**Temporality.** The temporal order of the exposure and development of the condition reported is important to supporting a causal inference. (*Id.* ¶ 67) Without understanding temporality, it is nearly impossible to learn anything about cause-and-effect. Cross-sectional studies are snapshots in time, and therefore do not account for the temporal order of the exposure and the development of the condition reported. (*Id.*) Cohort studies, in contrast, observe a group of study participants over a period of time, and can therefore establish the temporal order between exposure and development of the condition reported. (*Id.* ¶ 17.) Here, **the vast majority of studies identified and evaluated were cross-sectional, obscuring temporality**. (*Id.* ¶ 67.) Of the few studies that found statistically significant effect estimates, only two were cohort

studies. (*Id.*) This means that the small minority of studies finding any association between gas stoves and health effects is made up of an even smaller minority of cohort studies that could say anything about temporality. (*Id.*.) Consequently, the available evidence from cohort studies demonstrates that use of natural gas for cooking is **not associated with respiratory effects**." (*Id.*.)

**Specificity.** There are numerous potential causes associated with the kinds of respiratory symptoms and disease endpoints identified in the literature. (*Id.* ¶ 68.) Researchers considered at least 40 different confounding factors across all studies. (*Id.* ¶ 56.) These ranged from second-hand smoke to family history to housing. (*Id.* .) **More than 20 studies failed to consider any confounding factors at all, and over 10 more adjusted for three or fewer**. (*Id.*¶ 58 & Tables. 5–10.) Fewer than ten studies adjusted for ten or more factors. (*Id.* .) This is especially important because studies that did account for confounding factors found that those confounding factors played a more important role than gas stoves.  For example, one of the studies that controlled for confounding factors found tobacco smoke was responsible for **eleven times** more asthma cases than gas stoves (22% versus 2%), and dampness was responsible for ten times more asthma cases (20%), yet many studies failed to consider either of these confounding factors. (Benson Decl. ¶ 75.) This lack of specificity from failing to rigorously adjust for confounding factors limits the reliability of considering the studies together in a pooled analysis. (*Id.* ¶¶ 56, 68, 76, 80.)

**Dose Response.** The relationship between the magnitude of the exposure, or dose, and the likelihood of symptoms or disease endpoints, is another significant consideration. (*Id.* ¶ 69.) **None of the studies directly measured gas cooking exposures**, and many of the studies were based on less reliable self-reported conditions. (*Id.*) Thus, there is no direct evidence of dose

13

response. (*Id*. .) A recent study that alternatively used modeled emissions exposures together with the findings from a recent World Health Organization-funded meta-analysis found that the attribution of pediatric asthma cases to either gas stoves or long term exposure to natural gas was not statistically different from zero. (*Id*. ¶¶ 78–82.)

Taking these factors into consideration together demonstrates that "**there is no scientific consensus** that using gas stoves for home cooking is associated with or causes any health impacts or effects." (*Id*. ¶ 10 (emphasis added).) Additionally, "[t]he epidemiological evidence demonstrates that the risk of respiratory symptoms and diseases **are equivalent between those cooking with natural gas versus those using electricity**." (*Id*. ¶ 13 (emphasis added).) "To suggest there is a scientific consensus for such an association or causal relationship [between health impacts or effects and gas stove] **would be scientifically inappropriate and therefore factually inaccurate**." (*Id*. ¶ 10 (emphasis added).)

## C.    THE MORE RECENT DEBATE CONCERNING DECARBONIZATION, AND EFFORTS TO USE CONSUMER HEALTH ARGUMENTS TO FURTHER DECARBONIZATION GOALS

Despite the lack of scientific consensus, environmental interest groups have recently sought to stigmatize gas stoves by stoking health fears to further the transition away from legacy fuel sources and toward full electrification. Examples of this consistent effort emerged during the COVID-19 pandemic and have continued.

In May 2020, The Rocky Mountain Institute, a non-profit promoting electrification, published a report titled "Indoor Air Pollution: the Link between Climate and Health." (Duero Decl., Ex. E.) The report made this connection to gas stoves clear:

> Electrifying buildings is a key component of local climate and health action, as it
> reduces both the harmful emissions and health impacts related to buildings, and
> can be an important job creation tool.

(*Id*. at 1.) In October 2021, the Public Interest Research Group ("PIRG") published an article

promoting the Zero-Emissions Home Act as a means to help Americans shift from gas to electric

appliances because "gas stoves are a health hazard" and "cooking with gas is cooking our

planet." (Duero Decl., Ex. R at 1.)

In August 2022, the Harvard Environmental Law Review published an essay giving the

environmental justice movement an "antidote to the gas industry's climate obstruction

strategies:" rather than arguing about climate change, environmental justice advocates could

raise "the health hazards of indoor combustion." (Duero Decl., Ex. B at 2.) The essay concluded:

> [B]uilding electrification advocates must tell their own story about gas stoves, and
> it is hard to imagine any narrative more salient than the reality of an everyday
> kitchen appliance that is literally poisoning our children in their own homes.

(*Id*. at 19.) As demonstrated above, however, this "narrative" is disingenuous—the science does

not support the notion that gas stoves are causing harm to *anyone*—let alone "poisoning"

children—nor does the science support the notion that the health impacts of using gas stoves are

any different than the health impacts of using electric stoves.

The media, rather than understanding the interplay between the two separate issues of

consumer health and climate change, published summaries under panic headlines. The

Washington Post, in 2022, insisted in bold-face type "**Gas stove pollution causes 12.7% of**

**childhood asthma**." (Duero Decl. Ex. H.) The author of the study cited by the Washington Post

in support, however, had to clarify that the study "***does not assume or estimate a causal***

***relationship***." (Duero Decl. Ex. I at 2.) Moreover, the study on which the headline was loosely

based was deeply flawed. (Benson Decl. ¶¶ 71–77 (discussing the "several limitations associated

with" that analysis).

### D. UNITED STATES REGULATORS AND LEGISLATORS CONCLUDE GAS STOVES SHOULD NOT BE SINGLED OUT FOR REGULATION

Shortly after the Harvard Environmental Law Review article was published, then-

Commissioner of the U.S. Consumer Product Safety Commission, Richard Trumka Jr., told

Bloomberg News that gas stoves posed a "hidden hazard." (Duero Decl. Ex. F.) "Any option is

on the table," he said, adding that, "Products that can't be made safe can be banned." (*Id*.)

Trumka's comments ignited a firestorm. Some politicians insisted that action was necessary,

while others decried government overreach. (Duero Decl. Exs. F and G.) The U.S. House of

Representatives passed two bills to prohibit gas stoves from being singled out through federal

regulation, the Gas Stove Protection and Freedom Act (H.R. 1615) and the Save Our Gas Stoves

Act (H.R. 1640).[10] Both received bipartisan support but did not advance beyond House approval.

(*Id*..)

While Commissioner Trumka proposed that CPSC initiate rulemaking to regulate gas

stove emissions, he lacked support from other commissioners and withdrew the proposal. (Duero

Decl. Ex. U.) Instead, in early 2023 CPSC initiated a Request for Information concerning several

topics relating to gas stove emissions and health impacts. (Duero Decl. Ex. S.) Consistent with

its longstanding leadership in this area and collaborative efforts to formulate standards for gas

stoves, AHAM submitted comments on behalf of gas and electric cooking appliance

---

[10] *See* Congressional website, https://www.congress.gov/bill/118th-congress/house-bill/1615/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D ((H.R. 1615) and https://www.congress.gov/bill/118th-congress/house-bill/1640/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D (H.R. 1640).

manufacturers, with other comments from a range of organizations promoting decarbonization.

(Cooper Decl. ¶ 8.) Since then, CPSC has reaffirmed its position that it would not seek to ban gas

stoves and closed the request with no further action. (Duero Decl. Ex. D at 13.) Finally, the

Government Accountability Office most recently recognized in 2025, while HB25-1161 was

under debate, that there is "***no consensus on the health effects*** of nitrogen dioxide emissions

directly attributable to gas stove cooking." (*Id.* at 3.)

## E.    HB25-1161 PASSED WITHOUT ROBUST SCIENTIFIC DEBATE BUT CONSISTENT CLIMATE ATTENTION

From the time HB25-1161 was introduced, AHAM actively engaged with legislators,

alerting them that the science does not support that gas stoves cause any negative health impacts

nor are worse for health than electric stoves. AHAM contacted every legislator, and testified

before the House and Senate committees considering HB25-1161 with oral and written remarks.

HB25-1161 was first introduced by Representative Alex Valdez on February 3, 2025.

When introduced, and unlike the signed version, the bill required that a covered entity (defined

as a "wholesaler or supplier of a gas-fueled stove") must affix a yellow adhesive label to any

gas-fueled stove offered for sale in Colorado with the message, "**THIS APPLIANCE SHOULD**

**BE VENTILATED TO THE EXTERIOR WHEN IN USE**" in bold-face type. (Duero Decl.,

Ex. K at § 25-5-1602.) During HB25-1161's first hearing before the House Committee on

Energy and the Environment on February 19, 2025, all three non-sponsor supporting witnesses

were climate advocates, with one representing the Colorado Coalition for a Livable Climate

(Duero Decl. Ex. L at 11:5-11) and another 350 Colorado, a "a grassroots movement working to

build a fossil-free future" through "a variety of tactics, such as legislation and direct action, to

take on the climate crisis." (*Id*. at 14:21-23; Duero Decl. Ex. M.) The third testified to the need

for regulation to both address health effects and further decarbonization goals:

> [E]ven when vented properly, gas stoves remain problematic due to their reliance
> on natural gas . . . a significant source of methane emissions, which are 80 times
> more potent than carbon. . . .Our continued use of natural gas exacerbates climate
> change. To effectively discourage the use of gas stoves and promote cleaner
> alternatives, we must take comprehensive actions, including and beyond the
> labeling requirements of this bill.

(Duero Decl., Ex. L at 6:27-7:12; *see also id.* at 7:13-8:7, 9:19-25.)  Jacob Cassady, AHAM's

Director of Government Relations, testified against HB25-1161 in person and through three

pages of written remarks. (Cassady Decl., Ex. A & ¶ 6; Duero Decl., Ex. L at 12:21-14:17.) Mr.

Cassady explained that "AHAM is an active participant and supporter of organizations who set

standards and specify minimum ventilation rates that are acceptable for indoor use and minimize

the adverse health effects of cooking food." (Duero Decl., Ex. L at 13:13-17.) But "[s]imply

putting a label on one type of a cooking product gives consumers the false sense of security that

they don't need to ventilate while cooking food by other [] fuel sources." (*Id*. at 14:4-7.) Rep.

Valdez responded that the "use case" for applying the label to gas but not electric stoves is

because in the winter in Denver "a bunch of people boil[] water on their stove … to keep their

house from becoming any drier than it already is." (*Id*. at 24:4-9.) He continued that gas "needs

to be ventilated … [but] you could boil water with an electric stove without needing to ventilate

it." (*Id*. at 24:9-12.) The committee voted 9-4 to move HB25-1161 to the committee of the whole

with a favorable recommendation. (*Id*. at 27:5-7; 28:21.)

After the February 19, 2025 hearing, Mr. Cassady met with Representative Valdez to

continue discussion of AHAM's concerns, but subsequent amendments did not address those

concerns. (Cassady Decl. ¶ 7.) Instead, one of the first amendments was to remove the Safety

Clause, which stated, "The general assembly finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, or safety or for appropriations for the support and maintenance of the departments of the state and state institutions," and substitute a petition clause in its place. (*See* Duero Decl., Ex. O at 5:4-20; Ex. N2  (L.004 struck page 3, line 27, and page 4, which was the § 4 safety clause in initial bill, Ex. K) Along with another minor amendment, HB25-1161 passed the House.(*See* Duero Decl. Ex. N1.)

Around March 20, 2025, Jacob Cassady of AHAM contacted the members of the Senate Committee on Transportation and Energy to request a meeting in advance of the hearing on HB25-1161. This email explained:

> When cooking with any fuel source, proper ventilation is the most important factor to improving indoor air quality. Particulate matter (PM$_{2.5}$) is emitted during both gas and electric cooking and originating in the foodstuffs cooked. The legislation, as written, would lead a consumer to believe that they should only ventilate while cooking with gas fuel.

> AHAM is opposed to the legislation, as written, because it would require a misleading and inaccurate label to "warn" consumers that only cooking with gas requires ventilation or filtration to improve indoor air quality. Requiring a misleading label in statute fails to meet the public need for accurate information regarding indoor air quality. Public education should be correct and flexible to remain accurate in the future as science and innovations evolve.

(Cassady Decl. ¶ 8.)

On March 26, 2025, the Senate Committee on Transportation and Energy adopted a strike-below amendment, L.011, presented by bill co-sponsors Senators Cathy Kipp and Katie Wallace that entirely rewrote HB25-1161. (Duero Decl., Ex. P.) First, HB25-1161 as amended by L.011 changed the text of the required label from a statement about ventilation to a label stating "**UNDERSTAND THE AIR QUALITY IMPLICATIONS OF HAVING AN**

**INDOOR GAS STOVE.**" in bold-faced black type followed by a link or QR code to a web page

on the Colorado Department of Public Health and Environment ("CDPHE")'s website. (*Id*. § 25-

5-1602(1)(A).) Second, L.011 added Section 25-5-1602(4), which requires that the CDPHE

create a webpage about gas-stove health impacts for the required labels to reference:

> The Department shall establish a page on the Department's public website with
> information on the health impacts of gas-fueled stoves. The Department may
> include on the web page links to technical studies or other resources to assist the
> public in understanding the health impacts of gas-fueled stoves.

(*Id*. § 25-5-1602(4.) Third, L.011 required that retailers place the yellow adhesive label "on the

display model for a new gas-fueled stove" rather than requiring covered entities (retailers and

suppliers) to place a label on all new gas stoves sold in Colorado. (*Id*. § 25-5-1602(1)(A).) The

requirement for online sales of new gas-fueled stoves that retailers "prominently post on the

internet website where the online sale occurs the content of the adhesive label descried in

subsection (1)" remained unchanged. (*Id*. § 25-5-1602(3).)

At the committee hearing on March 26, two co-sponsors and four other witnesses

testified in support of HB25-1161. (Duero Decl. Ex. A.) Although each witness mentioned

purported health impacts of gas emissions, the witnesses' affiliations and testimony make clear

that they supported HB25-1161's singling out of gas stoves for a label about purported health

impacts at least in part because it furthered their climate goals. For example, HB25-1161 co-

sponsor Senator Katie Wallace, ended her remarks in support of the bill by stating, "I will just

wrap up by saying that gas appliances contribute to climate change, and must be part of the

conversation as we look to combat that existential crisis." (*Id*. at 5:14-17.) Katherine Goff, a past

President of Colorado Communities for Climate Action, was the most direct in explaining how

HB25-1161 supports environmental goals:

> Understanding environmental impacts, including emissions of carbon dioxide and
> other pollutants like nitrogen oxides, can help individuals choose products that
> align with their environmental values. It's important that consumers learn that gas
> stoves emit greenhouse gases that contribute to climate change. **By labeling
> appliances with a warning, manufacturers can encourage the development
> and adoption of cleaner alternatives**, like electric stoves or induction cooktops,
> which have lower environmental impacts.

(*Id*. at 13:17-14:1 (emphasis added)) (*See* also *Id*. at 14:11-18 ("requiring warning labels ensures

that manufacturers will meet our state emission standards"); 7:19-22 (representative of Colorado

Coalition for a Livable Climate); 9:14-18; 10:25-11:4 (representative of Colorado Communities

for Climate Action); 11:13-23 (retired senior engineer from the National Renewable Energy Lab

and "passionate supporter of policies which will advance Colorado's clean energy transition").

Jacob Cassady testified on behalf of AHAM and submitted written comments. (*Id*. at

17:23-20:1; Cassady Decl., Ex. C.) Mr. Cassady explained that the U.S. Government

Accountability Office had recently issued a report that "pointed out that there simply is no

conclusive evidence that has been laid out that puts increased asthma rates or other health

maladies on the use of natural gas cooking." (Duero Decl., Ex. A at 19:18-23.) AHAM further

expressed concern that putting a label on only gas cooking products was likely to mislead

consumers into thinking that ventilation during cooking is not needed for electric stoves. (*Id*.

at 18:21-19:1.) Finally, AHAM was concerned that the legislation's $20,000 per violation

penalty was excessive. (*Id*. at 19:2-9.) No sponsor or other witness at the hearing explained why

the bill was amended to shift from a label about ventilation to one about indoor air quality, and

the committee voted 6-3 to move the HB25-1161 as-amended to the Committee of the Whole

with a favorable recommendation. (*Id*. at 42:2-4, 42:23-25.)

On April 6, 2025, Jake Cassady, the Director of Government Relations for AHAM emailed all Colorado State Senators to request a No vote on HB25-1161. (Cassady Decl. ¶ 10.) Mr. Cassady attached a letter that explained, "AHAM supports appropriate and accurate science-based labels for all cooking products." (*Id*.) The April 6 AHAM letter continued, "**All Cooking – Gas or Electric – Emits Pollutants – Ventilation is Key**". (*Id*.) It noted that the U.S. Government Accountability Office (GAO) report on gas stoves, which was released March 18, 2025 and titled *Gas Stoves: Risks and Safety Standards Related to Products and Ventilation* concluded, "all cooking, regardless of fuel source, produces airborne particles" and this "Particulate matter, especially PM2.5 released as a function of cooking food, poses a greater risk to human health than the fuel source." (Duero Decl., Ex. D.) Finally, AHAM's April 6 letter explained that the "EPA does not list gas stoves as significant contributors to indoor air quality or health hazards." (Cassady Decl. ¶ 10.) While a 2024 WHO funded study found: "Compared with electricity, using gas for cooking or heating did not result in a higher risk estimate for asthma in children nor in adults." (Benson Decl. ¶ 89 & Ex. D.) Mr. Cassady sent an equivalent email and letter to all Colorado State Representatives on behalf of AHAM on April 7, 2025. (Cassady Decl., ¶ 11.)

On April 7, 2025, at the third reading of HB25-1161 in the Senate, Senator Kipp introduced Amendment L.015 to insert the descriptor "credible, evidence-based" before "information on the health impacts of gas-fueled stoves" in response to a request from unidentified individual(s). (Duero Decl., Ex. T  2:17-23.) Without further discussion, the Senate approved the amendment and passed HB25-1161 by a vote of 19-15 with one excused. (*Id*. at 4:19-20.) On April 11, 2025, HB25-1161 returned to the House floor. (Duero Decl. Ex. Q.)

Representative Valdez explained, "There were some significant changes made. It was essentially changed to a QR code that will inform folks of the information about ventilating their gas stoves. So changed a bit, but it's still a good bill. It will help people avoid breathing [] harmful stuff." (*Id*. at 2:12-17.)

There was no further discussion of the Senate's amendments. (Duero Decl. Ex. Q.) Representatives Gonzalez and DeGraaf briefly spoke in opposition to the bill. (*Id*. at 3:13-5:1.) The House then voted 40-22 with three excused to concur with the Senate Amendments and repass HB25-1161 without further discussion. (*Id*. at 3:8-9, 5:15-18.)

**F.      AHAM SOUGHT FURTHER ENGAGEMENT WITH THE STATE TO AVERT THE BILL'S IMPLEMENTATION, BUT THE STATE PUBLISHED THE WEBSITE TWO DAYS BEFORE THE LAW'S EFFECTIVE DATE, WITHOUT ANY STAKEHOLDER INPUT**

On April 12, 2025, Jake Cassady emailed Allie Kimmel in the Governor's office to request a meeting to discuss AHAM's concerns with HB25-1161 and the constitutional issues it raises in advance of submitting a formal letter requesting a veto. (Cassady Decl. ¶ 12.) On April 14, 2025, Mr. Cassady emailed Mark Silberg, the Energy Policy Advisor to the Governor, to request a meeting, which occurred on April 15. (*Id*. ¶ 13.) On April 17, 2025, AHAM emailed Governor Polis to request that he veto House Bill 25-1161. (*Id*. ¶ 15.) On April 30, AHAM sent a Veto Request Follow-up Letter to Governor Polis and Mr. Silberg. (*Id*. ¶ 16.) On June 2, Mr. Cassady emailed Mark Silberg to inform him, "In advance of Friday's deadline for Governor Polis to act on HB25-1161, CEOs at a number of AHAM member companies request an opportunity to discuss with the Governor the major implications and serious concerns with the legislation. Please let me know of any availability." (*Id*. ¶ 17.)

Governor Polis signed House Bill 25-1161 on June 4, 2025. After Governor Polis signed HB25-1161 on June 4, 2025, AHAM continued to coordinate with its members and other stakeholders, including the Colorado Retail Council, to discuss the implications of the legislation and its implementation. (Cassady Decl., ¶¶ 18-21.) On June 23, 2025, the President of the Colorado Retail Council emailed the CDPHE to confirm that they had not yet published the QR code or provided a link to the webpage that HB25-1161 requires Retailers to include on the label starting August 6. (*Id*. ¶ 18.) The Colorado Retail Council requested clarity so that retailers would have time to coordinate with merchants to meet the labeling requirement. (*Id*.) Around June 25, the Environmental Health and Sustainability Policy Manager for CDPHE responded that the agency planned to have the link available by the bill effective date. (*Id*.)

On July 1, the Colorado Retail Council contacted the CDPHE to request a 180-day delay on enforcement of the new law, until January 1, 2026, because it would be impossible for retailers to be in compliance with the law if the website is not published until the bill becomes effective:

> If the Department plans to provide our members with the required website link on the very day the bill becomes effective (August 6th) our retailers will have absolutely no chance to be in compliance with this new law. We must design labels, have them printed in two languages, ship them to our stores, instruct staff on which items should receive a label, apply the labels on the product, etc.

(*Id*. ¶ 20.) On July 2, the Environmental Health and Sustainability Policy Manager for CDPHE did not respond to the request for a delay on enforcement and stated that enforcement was up to the Attorney General's Office. (*Id*.) She further stated, "our team is actively working to finalize this webpage, and we're on track to publish it by the bill's effective date." (*Id*.)

On July 9, Jacob Cassady of AHAM emailed the Environmental Health and Sustainability Policy Manager for CDPHE: "Wanted to check on the website/QR code for gas stoves that is required by HB25-1161. My understanding is that by August 6, gas stoves on display for sale must have a sticker with specific language but also a QR code or weblink that connects consumers to a to be determined website. Please let me know if there are any updates on the website/code or if the site is complete." (*Id.* ¶ 19.) Mr. Cassady did not receive a response. (*Id.*)

On July 30, 2025, Mr. Cassady transmitted a letter from Kelly Mariotti, CEO of AHAM, to representatives with the Colorado Attorney General's Office and the CDPHE, advising of AHAM's intention to pursue litigation to challenge HB25-1161, to request a stay of enforcement, and to ask that counsel to the CDPHE contact counsel for AHAM to discuss those matters. (*Id.* ¶ 21.) A representative for the Attorney General responded after 5:00 p.m. on Friday August 1, 2025 that "someone from our office will be in touch on Monday[,]" August 4, 2025. (*Id.* ¶ 22.)

That day, August 4, CDPHE published the website about the purported health impacts of gas-fueled stoves required by C.R.S. Section 25-5-1602(4), with no opportunity for public comment or stakeholder input. (*Id.* ¶ 23.) The website is titled "Credible, Evidence-Based Information on the Health Impacts of Gas-Fueled Stoves." (Cassady Decl. Ex. O.) It lists several serious and potentially fatal adverse health conditions, including "cancers, such as leukemia," under the heading "**Health Impacts from Indoor Air Pollution Associated with Gas Stoves**." (*Id.*) Although it contains a 17-item "bibliography" containing links to various sources, it presents only "a minority view" of the available scientific literature and "omits the majority view

found in the scientific evidence" Dr. Benson reviewed. (Benson Decl. ¶ 24.) It includes none of

the overwhelming majority of epidemiological studies explaining the absence of statistically-

significant associations or causal relationships between gas stoves and adverse health effects. (*Id.*

¶¶ 10–12, 60 & Table 11.) And it does not recognize that the evidence "demonstrates that the

risk of respiratory symptoms and diseases are equivalent between those cooking with natural gas

versus those using electricity." (*Id.* ¶ 13.)  The website also links to "information provided by

other state governments for consistency" (Cassady Decl. Ex. O), although none of those other

state governments require gas stove retailers and manufacturers to distribute this type of one-

sided, misleading information to consumers. And, just as HB25-1161 was motivated, at least in

part, on the climate debate and furthering decarbonization, the CDPHE website cites materials

confirming "*natural gas use in buildings and homes ... is being targeted for a reason wholly

unrelated to indoor air quality: It is a fossil fuel*." (Duero Decl., Ex C at 2 (cited on CDPHE

website, Cassady Decl. O, at Bibliography n.5.)

## LEGAL STANDARD

"The standard for a TRO is the same as that for a preliminary injunction."[11] *Nellson v.*

*Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020) (citing *Wiechmann v. Ritter*, 44 F. App'x

346, 347 (10th Cir. 2002)). To obtain a TRO or preliminary injunction, the movant must establish

(1) a "substantial likelihood" of ultimate success on the merits; (2) a likelihood of "irreparable

harm in the absence of preliminary relief"; (3) that the "threatened harm outweighs the harm a

---

[11] "The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days." *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1058 (D.N.M. 2024) (citing Fed. R. Civ. P. 65(b)(1)-(2)).

preliminary injunction may pose to the opposing party"; and (4) that the injunction "will not adversely affect the public interest." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors "'merge' when, like here, the government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* The Federal Rules of Evidence do not apply to preliminary injunction proceedings, and the Court "may consider sworn proof including affidavits, including those based upon information and belief or hearsay (though it may affect the weight given)." *Pharmanex, Inc. v. HPF*, 221 F.3d 1352 (10th Cir. 2000) (unpublished table decision); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

## ARGUMENT

HB25-1161 compels AHAM's members, as well as retailers who sell their products, to publicly disseminate a message about "health impacts" and "air quality implications of having an indoor gas stove"—including messages suggesting that consumers could contract fatal diseases such as leukemia—that are divorced from scientific consensus. Available scientific research and data, when viewed together, does not support the statement that there are "air quality implications" or "health impacts" of "having an indoor gas stove," and they certainly do not support the

27

suggestion that any such "implications" or "impacts" materially differ from those associated with stoves that use other clean fuel sources, such as electricity. There is no scientifically valid consensus that consumers will contract "chronic heart and lung diseases" or "cancers" from gas stoves. As Dr. Benson explains through her sworn testimony, "*there is no scientific consensus* that using gas stoves for home cooking is associated with or causes any health impacts or effects," and "[t]o *suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate*." (Benson Decl. ¶ 10 (emphasis added).) Yet consumers have no way to discern this fact from the information AHAM's members are forced to disseminate to every potential purchaser of gas stoves in Colorado under HB25-1161. Reasonable consumers, without being given any information to the contrary and without the training and expertise necessary to understand this controversial scientific topic, will almost certainly be misled by HB25-1161's one-sided, scientifically unsupported, government-mandated content This is all the more so because, as Dr. Benson explains, "the CDPHE website only provides a minority view and omits the majority view found in the scientific evidence set out in the literature" she reviewed. (Benson Decl. ¶ 24.)

HB25-1161's compelled disclosures are therefore not constitutionally permissible, as a court recently found in rejecting an attempt to impose similar labeling requirements on gas-stove manufacturers through a putative class-action lawsuit. *Hedrick*, 2025 WL 1238363, at *6 (explaining that "there is no scientific consensus regarding" the purported "health risks" of using gas stoves, and, thus, forcing manufacturers to place a warning label on gas stoves "would be barred by the First Amendment").

HB25-1161, in truth, has nothing to do with consumer health; it is an attempt to compel AHAM's members to take sides in an ongoing, unrelated policy debate about climate change and decarbonization. While that policy debate has received close public attention, the State cannot, consistent with the First Amendment, force anyone to participate in it. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (explaining that prohibiting government-compelled speech is a core function of the First Amendment). Nor can the State force anyone to take any particular position on the subject. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (explaining that viewpoint-based speech laws are an "egregious" violation of the First Amendment). Yet unless AHAM's members enter this particular debate, in the particular manner the State has compelled using website content that can be changed or expanded at any time, HB25-1161 exposes them to severe consequences—branding them as engaging in "a deceptive trade practice" and subjecting them to potential civil lawsuits (including class actions) and government enforcement that could result in damages, penalties, and fee-shifting. Colo. Rev. Stat. §§ 6-1-110, -112b -113. HB25-1161 is not a science-based consumer health regulation; it is a viewpoint-based (or, at minimum, content-based) speech compulsion. AHAM is therefore likely to succeed on the merits of its First Amendment claim.

The remaining equitable factors likewise support immediate injunctive relief. Without that relief, AHAM's members will suffer irreparable harm—namely, the infringement of their First Amendment rights, which is per se irreparable. For the same reason, preliminary injunctive relief serves the public interest, because there is no public interest in compelling speech in violation of the Constitution, particularly where, as here, the compelled speech is scientifically unsupported

and misleading. The Court should therefore grant AHAM's request for a TRO and preliminary injunction.

## I.    AHAM IS LIKELY TO SUCCEED ON ITS FIRST AMENDMENT CLAIM.

HB25-1161 violates fundamental, well-established First Amendment principles. Because the law forces AHAM's members to take a position in an ongoing policy debate on a topic unrelated to consumer health, it is a content- and viewpoint-based speech compulsion and thus "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). It is subject, at minimum, to strict scrutiny and, because the State cannot justify HB25-1161 under this exacting standard, it must be enjoined.

But even putting aside that HB25-1161 is a content- and viewpoint-based regulation of speech, the law must be enjoined regardless of the level of constitutional scrutiny that applies. The "health impacts" and "air quality implications" HB25-1161 purports to address are unsupported by scientific consensus. The opposite is true—scientific consensus shows that there is *no* causal relationship between consumer health and the use of stoves fueled by gas rather than other energy sources.

### A.    HB25-1161, in Contrast to True Consumer Warning Laws, Compels Retailers, Including Manufacturers Who Engage in Online Sales, to Participate in an Ongoing Debate Unrelated to Consumer Health and Must Therefore Be Subjected to Strict Scrutiny.

HB25-1161 is starkly different from typical consumer warning laws. It includes no legislative findings, it identifies no particular health concerns, and it says nothing about potential mitigation measures. It instead required the State to create a misleading website without any public input that is contrary to scientific consensus and is highly misleading—and, just as concerning, may change over time, possibly in radical ways, without stakeholder involvement.

Traditional consumer warnings are specific, concrete, and supported by documented legislative findings. *See, e.g.*, 2023 Colo. Sess. Laws 2134 (making various declarations about Radon, including that "Radon is the leading cause of lung cancer in nonsmokers and the second leading cause of all lung cancer," and mandating a specific consumer disclosure that "strongly recommends" both testing and, if necessary, mitigation). All of these features are notably absent from HB25-1161, showing that HB25-1161 lacks scientific support and is pretextual.

The history of efforts by state and local governments to propose regulations targeting gas stoves—and the legislative history of HB25-1161 specifically—demonstrates that the motivation for HB25-1161's compelled-labeling requirement is not the health of consumers, but the ongoing policy debate over climate change and decarbonization. Despite a lengthy record of scientific research into the potential health effects of cooking with gas-fueled appliances, the science, at best, lacks consensus regarding *associations* between health impacts and indoor gas-fueled cooking. (Benson Decl. ¶¶ 10–11.) More importantly, there is no scientific basis at all for any *causal* relationship between gas-fueled cooking and consumer health. (*Id.* ¶¶ 10, 12.) "To suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate." (*Id.* ¶ 10.)

The legislative history of HB25-1161 makes clear that "health impacts" are not what animated its compelled speech requirements. The law—like other recent regulatory proposals singling out gas stoves—was instead motivated by separate concerns about climate change and decarbonization. (*See* Background, Section E, *supra* at 17-23.) HB25-1161 was originally drafted to warn consumers about the need to use ventilation while cooking with gas. (Duero Decl. Ex. K.) In response, AHAM opposed the bill as unnecessary because existing standards already ensure

that gas stove use is safe and are regularly reviewed for updates. In addition, putting a ventilation label on gas but not electric stoves misleads consumers, because cooking food generates certain emissions regardless of fuel source. (Duero Decl. Ex. L at 14:4-10.)

The General Assembly, however, abruptly rewrote the legislation. In its new form, HB25-1161 focused exclusively on the purported "health impacts of gas-fueled stoves," eliminating any reference to ventilation. (Duero Decl. Ex. P.) The bill's sponsors never directly explained why they made this drastic change. But the legislative record makes clear that the goal was to disincentivize consumers from purchasing gas stoves to promote decarbonization as a means of addressing climate change. One of the bill's sponsors admitted on the record that the bill was motivated in part by the "existential crisis" of climate change—even though nothing in the bill's language has any tie to that subject. (Duero Decl. Ex. A at 5:14-17.) And advocates on the subject of climate change were invited to testify in support of the bill. During both the House and Senate Committee hearings, all non-sponsor supporting witnesses were climate change advocates. (*See* Background, Section E, supra at 17-23.)

Concerns about the climate, while certainly worthy of public debate, have nothing to do with the health effects of gas-fueled stoves. Consumer health was, instead, used as a pretext to single out gas-fueled stoves for a compelled-speech regulation that lacks scientific basis.

One of the core functions of the First Amendment is to "prohibit[ ] the government from telling people what they must say." *Rumsfeld*, 547 U.S. at 61. Equally fundamental is the principle that the government may not regulate "expression because of its message, its ideas, its subject matter, or its content." *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)). "Content-based laws—those that

target speech based on its communicative content—are presumptively unconstitutional" and thus subject to strict scrutiny. *Reed*, 576 U.S. at 163.

Even more "blatant" and "egregious" is "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 168-69 (quoting *Rosenberger*, 515 U.S. at 829). "Indeed, there is an argument that such regulations are unconstitutional per se; the Supreme Court has said that 'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). At minimum, "[v]iewpoint-based restrictions receive even more critical judicial treatment" than strict scrutiny. *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279-80 (10th Cir. 1996). The Court must examine viewpoint-based speech regulations "with an especially critical review of the government's asserted justifications" and the regulations "must be narrowly drawn to effectuate a compelling state interest." *Id.* (quotation omitted).

It is clear that HB25-1161 compels speech, and it is equally clear that it does so on the basis of content and viewpoint. Motivated by the debate concerning climate change and the desire to promote decarbonization, the State enacted HB25-1161 to compel AHAM's members to provide consumers scientifically unsupported information[12] about the purported "health impacts" and "air

---

[12] The webpage includes information about the purported "health risks" and "health impacts" of gas stoves and includes links to several third-party websites and sources, some of which suggest that gas stove use should be curtailed to address climate concerns. Notably absent is any reference or links to third-party sources, such as the GAO and WHO, who have concluded that there is no scientific consensus that gas stoves are associated with any health risk. (Benson Decl. ¶¶ 54, 89 & Ex. D; Duero Decl. Ex. D at 3.)It thus requires private parties, including AHAM's members, to be a mouthpiece not only for the specific content created by the State but

quality implications" of gas stoves that the General Assembly hopes will dissuade consumers from buying them. (Duero Decl. Ex. A at 5:14-17 (stating, "gas appliances contribute to climate change, and must be part of the conversation as we look to combat that existential crisis"). HB25-1161 thus compels Retailers to participate in two ideological debates and express the State's view as to each: (1) that the use of gas stoves "contribute[s] to climate change" and (2) that, to further the goal of decarbonization, consumers should be dissuaded from purchasing gas-fueled stoves through scientifically unsupported warnings about "health impacts." (*See Id.*) The First Amendment does not permit the State to require AHAM's members, or the retailers who sell their products, to engage in the debate about climate change and decarbonization, let alone permit the State to force AHAM's members to participate in that debate through the pretextual means that HB25-1161 mandates. Indeed, the fact that HB25-1161 is "content based and, in practice, viewpoint discriminatory," is "all but dispositive" of its unconstitutionality. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

At a minimum, the Court must subject HB25-1161 to strict scrutiny "with an especially critical review of the government's asserted justifications."[13] *Church on the Rock*, 84 F.3d at 1279. As explained below, the State cannot satisfy this exceptionally demanding standard.

---

also State-selected content prepared by *other* entities or individuals who have views different from those of the private parties compelled to make the HB25-1161-mandated disclosure. Any of this content can be changed at any time without notice.

[13] For the reasons in Section I.C below, the speech compelled by HB25-1161 does not qualify for any form of scrutiny less rigorous than the "especially critical review" demanded of viewpoint-based compulsions of speech. That is true even if the State attempts to assert that HB25-1161 is a "commercial speech" regulation. Because it is viewpoint-based, HB25-1161 is subject to strict scrutiny regardless of how the State characterizes the type of speech it compels. *See, e.g.*, *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) ("A regulation of *commercial speech* that is not content-neutral is still subject to strict scrutiny." (emphasis

**B. The State Cannot Sustain Its Burden of Establishing That HB25-1161 Is Narrowly Tailored to Promote a Compelling State Interest.**

Strict scrutiny—"the most demanding test known to constitutional law"—requires the State to prove that a speech regulation is "the least restrictive means of achieving a compelling governmental interest." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). Throughout its history, the Supreme Court has "only once [held] that a law triggered but satisfied strict scrutiny." *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-39 (2010)). The State cannot meet its burden to satisfy this stringent test here.

HB25-1161 does not serve the only potential government interest it implicates—protection of consumer health.

First, as explained above, any health justification for the law is pretextual and therefore irrelevant. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 766 (2002) (holding that "the Court need not decide whether [an asserted interest] is a compelling state interest because, . . . the Court does not believe it was adopted for that purpose"). The legislative history and record

---

added)); *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 139 (3d Cir. 2020) ("[I]t may be appropriate to apply strict scrutiny to a restriction on commercial speech that is viewpoint-based."); *see also Summum v. Callaghan*, 130 F.3d 906, 917 (10th Cir. 1997) (holding that "although content-based discrimination is permissible in a limited or nonpublic forum," viewpoint discrimination is still "presumed impermissible" and subject to strict scrutiny); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 78 (2022) (Breyer, J., concurring) ("Courts help to protect . . . democratic values in part by strictly scrutinizing certain categories of laws that threaten to 'drive certain ideas or viewpoints from the marketplace.'" (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992))).

.

make clear that consumer health is not actually the aim of the law. If that concern were truly the law's aim, HB25-1161 would warn consumers to ensure adequate ventilation, as originally drafted, and would require warnings for *all* stoves rather than singling out those that are gas fueled. HB25-1161 does not do so, because its true purpose is ideological—to dissuade consumers from purchasing gas stoves as a means of addressing an unrelated policy concern and promoting a particular policy position, namely, a concern about climate change and the position that decarbonization should be pursued to address it. (*See* Background Section E, *supra* at 17-23.) That interest is content- and viewpoint-based. Consequently, it is, by definition, not compelling under the First Amendment. *Church on the Rock*, 84 F.3d at 1280 (holding that "no government entity may permissibly control the viewpoint being expressed" and explaining that the government should use its own funds "to convey its own message," rather than compelling private parties to do so).

Second, any purported interest in consumer health cannot be compelling with respect to HB25-1161 because the legislation does not "identify an actual concrete problem." *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012) (quoting *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530 (1980)); *see also Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 169 (2002) (finding no compelling interest where there was "an absence of any evidence of a special crime problem related to [the regulation on speech]"); *Awad*, 670 F.3d at 1130 ("Supreme Court case law instructs that overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest."). Here, there is no scientific support for the State's pretextual contention that gas stoves have "health impacts." None of the scientific studies investigating the potential health effects of cooking with

gas have identified any *cause and effect* relationship between gas cooking and any respiratory or other health condition. (Benson Decl. ¶¶ 10, 12.)  Nor is there even scientific support for an *association* between the use of gas stoves and any health impact. (*Id.* ¶¶ 10–11.) Thus, HB25-1161 rests on "[m]ere speculation of harm"—here, abstract "health impacts" and unstated concerns about indoor "air quality." *Awad*, 670 F.3d at 1129. This "does not constitute a compelling state interest." *Id.*

Separately, the State also cannot establish that HB25-1161 is "narrowly tailored" to achieving any interest in consumer health. Because the most potentially significant byproducts of gas cooking result from the cooking of the food (rather than from the fuel source itself), the risk of harm, if any, posed by cooking with gas is equivalent to the risk of harm, if any, posed by cooking with electricity (or other fuel sources). (Benson Decl. ¶ 13) Yet HB25-1161 singles out gas stoves, and only gas stoves, for its compelled disclosure. It is therefore "woefully underinclusive." *Republican Party of Minnesota*, 536 U.S. at 780. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). That is particularly true when, as here, the government relies on flawed studies that fail to prove a causal relationship between the targeted activity (here, use of gas stoves) and identified "harm" (consumer health). *Id.* (rejecting the government's reliance on methodologically flawed studies that relied on "correlation, not evidence of causation").

Moreover, HB25-1161's compelled disclosures are not the least restrictive means for advancing any interest the State may try to articulate. There is no indication the State has tried— or even considered—less burdensome alternatives, such as the State itself promoting and

disseminating the webpage, rather than forcing private parties to do so. *Rosenberger*, 515 U.S. at 833 ("[W]hen the State is the speaker, it may make content-based choices."). That is exactly what other states have done—as the HB25-1161-mandated website illustrates. (*See* Cassady Decl., Ex. O at 3 (citing state websites from Washington, Minnesota, California, and Illinois).) Yet HB25-1161, in an unprecedented step, forces AHAM's members and the retailers who sell their products to *themselves* endorse and carry the state-mandated message directly to every potential purchaser of their gas stoves in Colorado. That First Amendment violation alone should be dispositive, but HB25-1161 is unconstitutional even assuming there is a need to compel private parties to convey the State's message. Here, rather than compelling AHAM's members to provide consumers a specific, targeted message to advance a well-defined compelling interest, HB25-1161 mandates that private parties promote an entire government website containing information that is currently highly misleading and scientifically inaccurate and, just as concerning, is subject to change at any time and currently does, and "may include" in the future ". . . web page links to technical studies or other resources" from third parties with ideological views about unrelated topics such as climate change and decarbonization. HB25-1161 thus unconstitutionally compels "substantially more speech than is necessary to further the government's legitimate interests," to the extent any such interest exists. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). The State "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Evans v. Sandy City*, 944 F.3d 847, 856 (10th Cir. 2019) (quoting *McCullen*, 573 U.S. at 486). Here, the State has taken no steps or measures of any kind to ensure that the speech compelled by HB25-1161 will have the desired effect on consumers (let alone explained what that desired effect might be).

For all of these reasons, the State cannot satisfy its strict—and functionally insurmountable—burden of establishing that HB25-1161 is narrowly tailored to achieve a compelling State interest. AHAM is thus likely to succeed on the merits of its First Amendment claim.

### C. The State Cannot Escape Strict Scrutiny, Because Neither of the Narrow Exceptions to Strict Scrutiny for Commercial Speech Apply to HB25-1161.

Two "narrow and well-understood" exceptions to strict scrutiny apply in the context of what is called "commercial speech." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). First, under the framework of the Supreme Court's decision in *Central Hudson*, "'intermediate' scrutiny" applies to "restrictions on commercial speech." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)). Second, in certain situations, regulations that "impose a disclosure requirement rather than an affirmative limitation on speech" can be subject to *Zauderer*, a Supreme Court case that describes "less exacting scrutiny" for a limited category of commercial disclosure laws. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (citing *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)).

Neither "narrow" exception applies here.

#### 1. *Central Hudson* Does Not Apply Because HB25-1161 Is Not a Speech Restriction, Nor Does it Compel "Commercial Speech."

The Supreme Court's *Central Hudson* framework does not apply to HB25-1161 for two reasons.

First, HB25-1161 is not speech *restriction*, but a speech *compulsion.* In two leading First Amendment cases, the Supreme Court "strongly suggested" that "*Central Hudson* scrutiny is not

appropriate in a case involving compelled speech rather than restrictions on speech." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 580 n.10 (2005) (Souter, J., dissenting) (citing *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) and *United States v. United Foods, Inc.*, 533 U.S. 405 (2001)). Judges in this District have recognized the distinction. *All. of Health Care Sharing Ministries v. Conway*, No. 24-CV-01386-GPG-STV, 2025 WL 315389, at *28 (D. Colo. Jan. 13, 2025) (explaining that "laws *restricting* commercial speech" fall under *Central Hudson* while "laws that *compel* commercial speech" fall under *Zauderer*). Given the nature of HB25-1161 as a law that compels speech, *Central Hudson* is not the appropriate framework for evaluating its constitutionality.

Second, and separately, HB25-1161's mandated disclosures do not qualify as "commercial" speech. "[*T*]*he test* for identifying commercial speech" is whether the speech amounts to merely "the proposal of a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 473-74 (1989)). "[C]ommercial speech is best understood as speech that merely advertises a product or service for business purposes." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). In determining whether speech "may properly be characterized as commercial speech," the relevant factors are "(1) [the speech] is concededly an advertisement, (2) it refers to a specific product, or (3) it is motivated by an economic interest in selling the product." *United States v. Wenger*, 427 F.3d 840, 847 (10th Cir. 2005) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)).

None of those factors apply here. The disclosure mandated by HB25-1161 directs consumers to information contained on a webpage administered by the State (which directs

consumers to other webpages, including non-scientific commentary by private parties), which AHAM's members have no ability to control or even influence and can be unilaterally changed without notice at any time. The webpage does not "propose a commercial transaction" or "advertise" any products; indeed, the webpage does not even *reference* any specific product. Nor can the webpage fairly be characterized as a "product label" or "product information," given that it is distinct in physical location and content from the product label itself and will not (indeed, cannot, given available science) include any information about the particular product being sold. And those who are subject to HB25-1161, including AHAM's members, are not motivated to make the compelled disclosure by any interest other than compliance with the law. The HB25-1161 disclosure thus does not constitute "commercial speech" and is not subject to the *Central Hudson* framework. *SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1295 (D. Utah 2010) (finding that "press releases do not constitute commercial speech as they do not propose a commercial transaction").

2.    ***Zauderer* scrutiny does not apply because HB25-1161 does not compel commercial speech, does not regulate voluntary advertisements,** and **compels private parties to convey a non-factual and highly controversial message.**

In *Zauderer*, the Supreme Court considered the constitutionality of an Ohio law that, like the law in *Central Hudson*, regulated "purely commercial speech." 471 U.S. at 629. But this law was more targeted—it sought only to "to prevent potential deception of the public" by requiring certain disclosures in a lawyer's voluntary advertising about fee arrangements. *Id*. In that limited context, the Supreme Court found that the disclosure law was subject to a more relaxed standard of scrutiny, under which such commercial "disclosure requirements [need only be] reasonably related to the State's interest in preventing deception of consumers." *Id.* at 651. This narrow

exception to the baseline rule of strict scrutiny, which applies to all other compelled speech laws, does not apply to HB25-1161.

First, as explained above, HB25-1161 is not a regulation of "purely commercial speech." *Zauderer*, 471 U.S. at 629. The constitutional framework of *Zauderer* is therefore irrelevant.

Second, for *Zauderer* to apply, the challenged law must require an *additional* disclosure that accompanies a *voluntary advertisement*.[14] *See id.*; *United Foods*, 533 U.S. at 416 (distinguishing *Zauderer* because regulation at issue was not "necessary to make voluntary advertisements nonmisleading for consumers"); *see also Milavetz, Gallop & Milavetz, P.A.*, 559 U.S. at 249 (finding that *Zaunder* applied only because the challenged regulation affected those who were already engaged in advertising and because it required *additional* disclosures to prevent the advertisements from being misleading). HB25-1161, however, compels speech "unrelated to the interest in avoiding misleading or incomplete commercial messages." *Glickman*, 521 U.S. at 491 (Souter, J., dissenting). It is not a regulation of any "voluntary advertisement" and does not mandate *additional* disclosures to make a voluntary advertisement more accurate. Its sole object

---

[14] Despite the Supreme Court's clear guidance in *Zauderer* and its progeny that *Zauderer* scrutiny applies *only* to disclosures accompanying "commercial advertising," *Zauderer*, 471 U.S. at 651, that are "directed at misleading commercial speech," *Milavetz, Gallop & Milavetz, P.A.*, 559 U.S. at 230, some courts have improperly expanded the scope of *Zauderer* beyond that limited context. *See R J Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 882 (5th Cir. 2024). The Tenth Circuit has not adopted that expansive approach and neither should this court, particularly in this case. The rationale of the "narrow" exception in *Zauderer* was expressly premised upon (1) advertisers having a "minimal" interest "in *not* providing any particular factual information in [their] advertising," and (2) "the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. Neither applies to HB25-1161's compelled disclosure.

is to mandate a novel, non-consensus government-compelled disclosure that no private party would convey unless forced to. That makes *Zauderer* inapplicable.

Third, to qualify for *Zaunderer* scrutiny, the compelled disclosure must be limited to "purely factual and uncontroversial information." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018); *Wenger*, 427 F.3d at 849 (explaining that *Zauderer* applies only "where a regulation requires disclosure only of factual and uncontroversial information"). The HB25-1161 disclosure—which requires AHAM's members to disclose, through a webpage link, information regarding the purported "health impacts of gas-fueled stoves"—satisfies neither requirement.

Although "[i]nformation that is purely factual is necessarily 'factually accurate,' . . . that alone is not enough to qualify for the *Zauderer* exception." *Nat'l Ass'n of Wheat Growers v. Bonta* ("*Wheat Growers*"), 85 F.4th 1263, 1276 (9th Cir. 2023). This is because "a statement may be literally true but nonetheless misleading and, in that sense, untrue." *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 847 (9th Cir. 2019). In the context of a required disclosure regarding purported health risks, even where a proposed disclosure is "entirely and literally true," that is insufficient when the disclosure relates to purported health risks that are the subject of "a legitimately unresolved scientific debate." *Wheat Growers*, 85 F.4th at 1279.

The HB25-1161-mandated webpage includes information expressly stating that gas stoves, and not stoves that use other fuel sources, are "associated with" severe consumer "health risks." Yet there is no scientific consensus to that effect. "Based on established scientific principles, there is no scientific consensus that using gas stoves for home cooking is associated with or causes any health impacts or effects." (Benson Decl. ¶ 10.) There is no scientific consensus that cooking with natural gas is associated with negative birth outcomes, cancer, or cardiovascular disease. (*Id.* ¶¶

43

49-15.) And the "risk of respiratory symptoms and diseases are equivalent between those cooking with natural gas versus those using electricity or clean fuels." (*Id.* ¶ 13, 52-54.) "To suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate." (*Id*.¶ 10.) Regulators and health organizations worldwide have acknowledge the lack of scientific consensus and determined that singling out gas stoves for regulation is unnecessary. Thus, *at most*, the content of the HB25-1161 label and website is the subject an ongoing, unresolved debate.[15] In fact, it is far worse, because the website does not even inform consumers of that debate but instead presents an entirely one-sided view that is unsupported by scientific consensus—in other words, it "only provides a minority view and omits the majority view found in the scientific evidence." (*Id.* ¶ 24.)

In light of the lack of scientific consensus, any disclosure regarding purported "health impacts" of gas stoves—even one that was "factually true" and attempted to place both sides of the debate on "equal footing"—would not be "purely factual." *Wheat Growers*, 85 F.4th at 1281 (rejecting "factually true" warning that proposed to notify consumers that regulatory bodies had reached conflicting conclusions regarding whether chemical was unsafe). Put another way, to be factual, the disclosures must be "inferable from scientific observation." *R J Reynolds Tobacco Co.*, 96 F.4th at 881 (5th Cir.). Here, however, "there is no scientific consensus that using gas stoves for home cooking is associated with or causes any health impacts or effects" and to suggest otherwise is "scientifically inappropriate" and "factually inaccurate." (Benson Decl. ¶ 10.) By its

---

[15] Even if all of the information contained on the HB25-1161-mandated webpage were purely factual and entirely neutral—*e.g.*, a mere list of links to every available study—the context of the disclosure combined with the use of the phrase "health impacts" would —"still convey[ ] the overall message that [the product] is unsafe." *Wheat Growers*, 85 F.4th at 1281.

very nature, then, the HB25-1161 disclosure forces AHAM's members to "convey[ ] the overall message that [the use of gas stoves] is unsafe which is, at best, disputed." *Wheat Growers*, 85 F.4th at 1281 (quotation omitted).

Separately, HB25-1161's disclosure regarding the purported "health impacts" of cooking with gas is "controversial." "[A] compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd*, 145 S. Ct. 2291 (2025); *see also R J Reynolds Tobacco Co.*, 96 F.4th at 881. When there is "robust disagreement by reputable scientific sources" about the purported health impacts posed by a product, compelling the seller to warn of those dangers is objectively controversial. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). "From the standpoint of an average consumer, saying that something . . . has serious deleterious health effects—without a strong scientific consensus that it does—remains controversial." *Wheat Growers*, 85 F.4th at 1281. Whether a compelled disclosure is "controversial" is measured both objectively and subjectively. *Id.* at 1277.

Because there is no "scientific consensus" that using gas stoves is associated with—let alone causes—any health impacts (Benson Decl. ¶ 10), the HB25-1161 disclosure "is undeniably controversial from an objective scientific standpoint." *Id.* at 1278; *cf. Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (finding warning controversial where two organizations, including the American Cancer Society, found chemical was not likely to be related to a risk for cancer, but three other organizations, including the EPA,

found the chemical "likely to be carcinogenic to humans"). HB25-1161 is also *subjectively* controversial, because it forces regulated parties "'to convey a message fundamentally at odds' with their businesses." *Wheat Growers*, 85 F.4th at 1278 (quoting *CTIA*, 928 F.3d at 845). And, finally, HB25-1161 impermissibly requires affected sellers to take "sides in a heated political controversy." *CTIA*, 928 F.3d at 845. As explained above, HB25-1161 was motivated by the ongoing debate surrounding climate change and the elimi0nation of fossil fuels. That is one of the most significant, and intensely debated, political issues of our time. As one of the sources on the HB25-1161-mandated website explains, gas stoves have been drawn into that debate and, as a result, the use of gas stoves has itself become a contentious, controversial topic of public debate. (*See* (Duero Decl., Ex C at 2 (cited on CDPHE website, Cassady Decl. O, at Bibliography n.5.) ("[N]atural gas use in buildings and homes … is being targeted for a reason wholly unrelated to indoor air quality: It is a fossil fuel.").)

The "genuine, scientific controversy" regarding whether gas stoves are associated with any health impacts "is sufficient to place [the HB25-1161 disclosure] outside the realm of the lower level of review under *Zauderer*." *Wheat Growers*, 85 F.4th at 1282. A few months ago, a judge in the Central District of California reached this exact conclusion. In an order dismissing putative class actions against AHAM members for an alleged failure to disclose the risks of cooking with gas, the judge explained, after evaluating the state of the science, that the plaintiffs' claims "would be barred by the First Amendment," because "there is no scientific consensus regarding [the alleged] health risks." *Hedrick*, 2025 WL 1238363, at *6.

**D.      Even if HB25-1161 Were a Commercial Speech Regulation, it Could Not Withstand Intermediate Scrutiny under *Central Hudson* or the Standards of *Zauderer*.**

Neither *Central Hudson* nor *Zauderer* apply to HB25-1161 for the reasons above. But even if they did apply, HB25-1161 fails to satisfy them.

**1.      The State Cannot Meet Its Burden Under the Intermediate Scrutiny Test of *Central Hudson*.**

Under *Central Hudson*, "the government may restrict the speech only if it proves: (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1233 (10th Cir. 1999). "It is well established that '[t]he party seeking to uphold a restriction on commercial speech'" must satisfy "'the burden of justifying it.'" *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (quoting *Bolger*, 463 U.S. at 71, n.20 (1993)).

Here, for the same reason the State cannot demonstrate a *compelling* interest, it cannot prove a *substantial* interest: the purported interest in "health impacts" to consumers of gas stoves is pretextual. It is also speculative, given the lack of scientific consensus. "[T]he Supreme Court has made clear that a state may not regulate commercial speech on the back of controverted evidence." *Wheat Growers*, 85 F.4th at 1282 (citing *Brown*, 564 U.S. at 786). HB25-1161 improperly seeks to encumber the free speech rights of private parties "to prevent something that does not appear to occur"—health impacts from cooking with gas. *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117–18 (9th Cir. 2023) ("The First Amendment requires more than fact-free inferences to justify governmental infringement on speech."). There is thus no interest, compelling, substantial, or otherwise, that could support the constitutionality of HB25-1161.

Given that there is no support for the contention that cooking with gas causes any "health impacts" (Benson Decl. ¶ 10), it is axiomatic that HB25-1161 cannot "directly and materially advance" the State's purported interest in preventing them. Nor can the State "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *U.S. West, Inc.*, 182 F.3d at 1237 (quoting *Edenfield*, 507 U.S. at 771). Even if the State were able to establish that it has a valid health interest, "compelling [AHAM's members] to warn consumers of a potential [health impact] never confirmed by any regulatory body—or of a hazard not 'known' to more than a small subset of the scientific community—does not directly advance that interest." *Wheat Growers*, 85 F.4th at 1283; *Free Speech Coal., Inc.*, 95 F.4th at 284 ("adopt[ing] the approach recently taken by the Ninth Circuit" in *Wheat Growers*). Indeed, "the fact that science is evolving is all the more reason to provide robust First Amendment protections." *Wheat Growers*, 85 F.4th at 1283.

Finally, just as the State cannot demonstrate that HB25-1161 is narrowly tailored for purposes of strict scrutiny, it cannot show that the law "is no more extensive than necessary" under *Central Hudson*. Where, as here, the government seeks to compel a disclosure of purported health impacts that are the subject of unresolved scientific debate, the government has sufficient other means to promote its view that the product may "put[] humans at risk . . . 'without burdening [the sellers] with unwanted speech.'" *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 757). For example, the government "could reasonably post information about [the purported health risks] on its own website or conduct an advertising campaign"—neither of which would "co-opt [the sellers] to deliver its message for it." *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 757). Again, that is exactly what other states did—Colorado stands alone in forcing AHAM's

48

members and retailers who sell their products to be the conduits for the State's own "advertising campaign."

### 2.    HB25-1161 Fails *Zauderer* Scrutiny.

HB25-1161 also would fail under *Zauderer* scrutiny. "Even under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651). Here, given the lack of scientific support, and for the reasons above, the State cannot demonstrate that HB25-1161 would "remedy a harm that is potentially real, not purely hypothetical." *Id.* at 776. Instead, the purported harm is entirely pretextual.

Nor, for the reasons above, can the State prove that HB25-1161 "extend[s] no broader than reasonably necessary." *Id.* at 776. The State cannot show that the HB25-1161 disclosure would have the desired effect on consumers (assuming the State desires that the law have any permissible effect) or that it is sufficiently tailored to the State's interest. Instead, HB25-1161 "imposes a government-scripted, speaker-based disclosure requirement that is wholly disconnected from [the State's] informational interest." *Id.* at 777. Indeed, the legislators who advocated for and ultimately passed HB25-1161 did not even know what content the webpage would include or to which outside sources it would cite.

## II.    THE REMAINING FACTORS SUPPORT A TRO AND PRELIMINARY INJUNCTION.

Because AHAM has demonstrated that it is likely to succeed on the merits of its First Amendment claim and, thus, that its members' First Amendment rights will be infringed without the entry of a TRO and preliminary injunction, all of the remaining factors also weigh in favor of the entry of injunctive relief. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th

Cir. 2013) ("[I]n First Amendment cases, the likelihood of success on the merits will often be the

determinative factor.") (quoting *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Pryor*

*v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) ("[O]ur precedent is clear that a First

Amendment violation constitutes irreparable injury."). That is particularly true here, where the

State seeks to compel AHAM's members to disseminate and endorse a pretextual message in

support of a state-mandated ideological message. Furthermore, the very message HB25-1161

compels AHAM's members to promote would mislead consumers and undoubtedly stigmatize

AHAM members' products. This is plainly irreparable injury. *See Trial Laws. Coll. v. Gerry*

*Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1272 (10th Cir. 2022) (finding

irreparable injury based upon evidence of risk of harm to "reputation and goodwill").

"[W]hen [a] law . . . is likely unconstitutional, the[ ] interests [of those the government

represents, such as voters] do not outweigh [a plaintiff's interest] in having [its] constitutional

rights protected." *Hobby Lobby Stores, Inc.*, 723 F.3d at 1145 (quoting *Awad*, 670 F.3d at 1131-

32 (modifications in original).) For the reasons explained above, the State has not put forth any

legitimate interest in the enforcement of HB25-1161, but, even if it had, even "undeniably

admirable goals" of the State "must yield when they collide with the . . . Constitution." *X Corp.*

*v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (quotations omitted). Moreover, "it is always in the

public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores,*

*Inc.*, 723 F.3d at 1145 (quoting *Awad*, 670 F.3d at 1132). The public interest also "is served by

preventing consumer confusion in the marketplace." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*,

263 F.3d 1297, 1304 (11th Cir. 2001). HB25-1161 would create confusion in the marketplace by requiring retailers to direct consumers to information that would misinform them about the purported health impacts of gas stoves and mislead consumers into thinking that gas stoves are more dangerous than electric stoves when the risks, if any, actually are equivalent.

## CONCLUSION

For the following reasons, this Court should grant a TRO and preliminary injunction prohibiting Defendants from enforcing HB25-1161 before it takes effect.

Dated: August 5, 2025                    Respectfully submitted,

                                         *s/ Frederick R. Yarger*
                                         Frederick R. Yarger
                                         Andrew M. Unthank
                                         Herman J. Hoying
                                         Wheeler Trigg O'Donnell LLP
                                         370 Seventeenth Street, Suite 4500
                                         Denver, CO 80202-5647
                                         Telephone:    303.244.1800
                                         Facsimile:    303.244.1879
                                         Email:    yarger@wtotrial.com
                                                   unthank@wtotrial.com
                                                   hoying@wtotrial.com

                                         *Attorneys for Plaintiff Association of Home*
                                         *Appliance Manufacturers*

## CERTIFICATION PURSUANT TO
## LOCAL RULES 7.1(A) AND 65.1(A)

Counsel for AHAM certifies as follows:

Representatives of AHAM were active participants during the legislative process. AHAM contacted every legislator, and testified before the House and Senate committees considering HB25-1161 with oral and written remarks. Following passage by the legislature, AHAM sent Governor Jared Polis two letters encouraging him to veto the law in light of AHAM's concerns, including that the legislation would violate Retailers' First Amendment Rights.

In June and early July of this year, the President of the Colorado Retail Council requested that the CDPHE delay enforcement of HB25-1161 for 180 days. (Cassady Decl., ¶ 20.) That request was ignored. (*Id*.)

On July 9, Jacob Cassady of AHAM emailed Rachel Roussel-Diamond: "Wanted to check on the website/QR code for gas stoves that is required by HB25-1161. My understanding is that by August 6, gas stoves on display for sale must have a sticker with specific language but also a QR code or weblink that connects consumers to a to be determined website. Please let me know if there are any updates on the website/code or if the site is complete." (*Id*. ¶ 19.) Mr. Cassady did not receive a response. (*Id*.)

On July 30, 2025, Kelly Mariotti, CEO of AHAM, sent a letter to representatives with the Colorado Attorney General's Office and the CDPHE, notifying them that AHAM had retained counsel to challenge the law, which is otherwise set to go into effect on Wednesday, August 6, 2025. (*Id*. ¶ 21.) AHAM requested that the State agree to postpone enforcement of the law and asked that the Attorney General's office speak to AHAM's counsel about that request. (*Id*.) A representative of the Attorney General responded after 5:00 p.m. on Friday August 1, 2025 that

"someone from our office will be in touch . . . on Monday[,]" August 4, 2025. (*Id.* ¶ 22.) That day, August 4, CDPHE published the website about the purported health impacts of gas-fueled stoves required by HB25-1161, with no opportunity for public comment or stakeholder input. (*Id.* ¶ 23.) On August 4, 2025, a representative of the Attorney General requested to meet with AHAM's counsel on the afternoon of Tuesday, August 5, 2025—less than 24 hours before HB25-1161 takes effect.

On the afternoon of August 5, 2025, counsel for AHAM spoke with counsel for Defendants and explained the bases for the First Amendment challenge and the need to halt the implementation of HB25-1161. Counsel for Defendants responded that Defendants are unwilling to pause implementation and enforcement of HB25-1161 or to temporarily remove the website. Accordingly, this Motion for TRO and Preliminary Injunction is necessary to prevent the irreparable harm AHAM and its members face if HB25-1161 is permitted to take effect.

AHAM has provided Defendants with actual notice of the motion, and copies of all pleadings and documents filed in the action to date, via email immediately before filing the complaint. AHAM will provide Defendants with file-stamped copies of all filings as soon as possible after the filing is complete via e-mail to their counsel and will formally serve these papers on all Defendants as soon as possible.