IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02417-SKC-KAS

ASSOCIATION OF HOME APPLIANCE
MANUFACTURERS,

       Plaintiff,

v.

JILL HUNSAKER RYAN, in her official capacity as
Executive Director of the Colorado Department of
Public Health & Environment (CDPHE),

JEFF LAWRENCE, in his official capacity as Director
of the Environmental Health and Sustainability
Division of the CDPHE, and

PHIL WEISER, in his official capacity as Colorado
Attorney General,

       Defendants.

---

## MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND.......................................................................................................... 3

A.    THE ASSOCIATION OF HOME APPLIANCE MANUFACTURERS ............. 3

B.    GAS STOVES POSE NO GREATER HEALTH RISKS THAN
      ELECTRIC RANGES............................................................................................. 4

C.    CLIMATE ADVOCATES RECENTLY BEGAN USING CONSUMER-
      HEALTH ARGUMENTS TO FURTHER DECARBONIZATION
      GOALS.................................................................................................................... 6

D.    UNITED STATES REGULATORS AND LEGISLATORS CONCLUDE
      GAS STOVES SHOULD NOT BE SINGLED OUT FOR
      REGULATION ..................................................................................................... 7

E.    HB25-1161 PASSED WITHOUT ROBUST SCIENTIFIC DEBATE
      BUT CONSISTENT CLIMATE ATTENTION ................................................. 8

F.    CDPHE PUBLISHED THE WEBSITE TWO DAYS BEFORE THE
      EFFECTIVE DATE, WITHOUT STAKEHOLDER INPUT........................... 11

LEGAL STANDARD................................................................................................. 14

ARGUMENT ............................................................................................................. 14

I.    AHAM IS LIKELY TO SUCCEED ON ITS FIRST
      AMENDMENT CLAIM.......................................................................... 16

      A.    HB25-1161 Compels Participation in an Ongoing Debate
            Unrelated to Consumer Health................................................... 16

      B.    The State Cannot Sustain Its Burden of Establishing
            HB25-1161 Is Narrowly Tailored to Promote a Compelling
            State Interest. ................................................................................. 19

      C.    Neither of the Narrow Exceptions to Strict Scrutiny for
            Commercial Speech Apply to HB25-1161.................................. 22

1.   *Central Hudson* Does Not Apply Because HB25-1161 Does Not *Restrict* "Commercial Speech." ................ 22

2.   *Zauderer* does not apply because HB25-1161 does not compel commercial speech or regulate advertising, and compels non-factual and highly controversial speech.......................................................... 23

D.   Regardless, HB25-1161 Cannot Withstand Intermediate Scrutiny under *Central Hudson* or the Standards of *Zauderer*........................................................................ 27

1.   The State Cannot Satisfy *Central Hudson*. .................... 27

2.   HB25-1161 Fails *Zauderer* Scrutiny. ............................... 29

II.   THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION. ........................................................................ 29

CONCLUSION................................................................................... 30

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a) ........................................ 32

CERTIFICATION REGARDING THE USE OF GENERATIVE AI ......................... 32

# TABLE OF AUTHORITIES

## CASES

*All. of Health Care Sharing Ministries v. Conway,*
No. 24-CV-01386-GPG-STV, 2025 WL 315389
(D. Colo. Jan. 13, 2025) ............................................................................. 23

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) .......................................................... 20, 30

*Bd. of Trs. of State Univ. of New York v. Fox,*
492 U.S. 469 (1989) ...................................................................................... 23

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ...................................................................................... 21

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
29 F.4th 468 (9th Cir. 2022) ....................................................................... 26

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
95 F.3d 959 (10th Cir. 1996) ....................................................................... 23

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
447 U.S. 557 (1980) ................................................................ 22, 23, 27, 28

*Church on the Rock v. City of Albuquerque,*
84 F.3d 1273 (10th Cir. 1996) ............................................................. 18, 20

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ...................................................................................... 19

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ...................................................................................... 23

*CTIA—The Wireless Ass'n v. City of Berkeley,*
928 F.3d 832 (9th Cir. 2019) ................................................................ 24, 26

*Davidoff & CIE, S.A. v. PLD Int'l Corp.,*
263 F.3d 1297 (11th Cir. 2001) .................................................................. 30

*Edenfield v. Fane,*
507 U.S. 761 (1993) ................................................................................ 27, 28

*Elrod v. Burns,*
　427 U.S. 347 (1976) ........................................................................................ 29

*Fla. Bar v. Went For It, Inc.,*
　515 U.S. 618 (1995) ........................................................................................ 22

*Free Speech Coal., Inc. v. Paxton,*
　145 S. Ct. 2291 (2025) ............................................................................... 19, 26

*Free Speech Coal., Inc. v. Paxton,* 95 F.4th 263 (5th Cir. 2024) ........................... 26, 28

*Glickman v. Wileman Bros. & Elliott, Inc.,*
　521 U.S. 457 (1997) ................................................................................... 23, 24

*Hedrick v. BSH Home Appliances Corp.,*
　No. 2:23-CV-04752-JWH-JDE, 2025 WL 1238363
　(C.D. Cal. Apr. 28, 2025) ....................................................................... 2, 16, 27

*Hobby Lobby Stores, Inc. v. Sebelius,*
　723 F.3d 1114 (10th Cir. 2013) .................................................................. 29, 30

*Holder v. Humanitarian Law Project,*
　561 U.S. 1 (2010) ........................................................................................... 19

*Johanns v. Livestock Mktg. Ass'n,*
　544 U.S. 550 (2005) ........................................................................................ 22

*Junior Sports Mags. Inc. v. Bonta,*
　80 F.4th 1109 (9th Cir. 2023) ......................................................................... 27

*McCullen v. Coakley,*
　573 U.S. 464 (2014) ........................................................................................ 22

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
　559 U.S. 229 (2010) ........................................................................................ 22

*Nat'l Ass'n of Wheat Growers v. Bonta,*
　85 F.4th 1263 (9th Cir. 2023) ................................................................. passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
　585 U.S. 755 (2018) ............................................................................. 24, 28, 29

*Nken v. Holder,*
　556 U.S. 418 (2009) ........................................................................................ 14

*Otto v. City of Boca Raton*,
　　981 F.3d 854 (11th Cir. 2020) ................................................................ 18

*R J Reynolds Tobacco Co. v. Food & Drug Admin.*,
　　96 F.4th 863 (5th Cir. 2024) .................................................................. 26

*Reed v. Town of Gilbert*,
　　576 U.S. 155 (2015) ........................................................................ 15, 18

*Republican Party of Minnesota v. White*,
　　536 U.S. 765 (2002) ........................................................................ 19, 21

*Riley v. Nat'l Fed. of the Blind*,
　　487 U.S. 781 (1988) ............................................................................ 2

*Rocky Mountain Gun Owners v. Polis*,
　　121 F.4th 96 (10th Cir. 2024) ............................................................... 14

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　　515 U.S. 819 (1995) ........................................................................ 16, 18

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
　　547 U.S. 47 (2006) ......................................................................... 15, 18

*Sorrell v. IMS Health Inc.*,
　　564 U.S. 552 (2011) ........................................................................... 19

*Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*,
　　23 F.4th 1262 (10th Cir. 2022) ............................................................. 30

*Turner Broad. Sys., Inc. v. F.C.C.*,
　　512 U.S. 622 (1994) ........................................................................... 22

*U.S. West, Inc. v. F.C.C.*,
　　182 F.3d 1224 (10th Cir. 1999) ........................................................ 27, 28

*United States v. United Foods, Inc.*,
　　533 U.S. 405 (2001) ........................................................................ 23, 24

*Ward v. Rock Against Racism*,
　　491 U.S. 781 (1989) ........................................................................... 22

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
　　536 U.S. 150 (2002) ........................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 14

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ........................................................................... 30

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
    471 U.S. 626 (1985) ................................................................................... passim

**STATUTES**

Colo. Rev. Stat. § 6-1-110 ............................................................................... 15

Colo. Rev. Stat. § 6-1-112 ............................................................................... 15

Colo. Rev. Stat. § 6-1-113 ............................................................................... 15

## INTRODUCTION

The Association of Home Appliance Manufacturers ("AHAM") moves for a preliminary injunction to protect its members' First Amendment rights against the unconstitutional compelled speech mandated by Colorado House Bill 25-1161 ("HB25-1161," attached as Ex. 1), which requires AHAM's members to disseminate biased, misleading, inaccurate information about their products. HB25-1161 compels a prominent warning label for every gas stove displayed for sale to Colorado consumers, stating, "**UNDERSTAND THE AIR QUALITY IMPLICATIONS OF HAVING AN INDOOR GAS STOVE**." The label must link to a government website containing "information on the health impacts of gas-fueled stoves," directly tying the "air quality implications" asserted in the label to purported human health outcomes. The website was created by the Colorado Department of Public Health and Environment ("CDPHE") with no opportunity for public comment, and is titled "**Credible, Evidence-Based Information on the Health Impacts of Gas-Fueled Stoves**." The website can change any time, without notice to or input from stakeholders. It lists serious, potentially fatal conditions—including "chronic heart and lung diseases" and "leukemia"—which the website claims are "Associated with Gas Stoves." (CDPHE website, Ex. 2.) Failure to disseminate this message is a "deceptive trade practice," exposing AHAM's members to severe penalties under the Colorado Consumer Protection Act, including fines up to $20,000 per violation.

The suggestion that gas stoves, and only gas stoves, pose health risks is contrary to overwhelming scientific consensus. The vast majority of research finds no association, let alone any causal relationship, between gas stoves and adverse health outcomes. Indeed, the scientific consensus is that the potential health risks of cooking

with gas are *no different from cooking with electricity*. HB25-1161's government-compelled website, however, ignores this consensus. It presents *only minority views* of available literature, "[m]andating speech that [AHAM's members] would not otherwise make" and "necessarily alter[ing] the content of the[ir] speech." *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 795 (1988).

Because HB25-1161 forces AHAM's members to promote a message about the purported "health impacts" of gas stoves that contravenes scientific consensus, it is unconstitutional. The First Amendment prohibits compelled disclosures unless they are "purely factual and uncontroversial." Government-mandated disclosures divorced from scientific consensus are neither purely factual nor uncontroversial. Indeed, the Central District of California, examining this same free speech issue, recently held that because "there is no scientific consensus regarding" the purported "health risks" of using gas stoves, forcing manufacturers to place a warning label on gas stoves "would be barred by the First Amendment." *Hedrick v. BSH Home Appliances Corp.*, No. 2:23-CV-04752-JWH-JDE, 2025 WL 1238363, at *6 (C.D. Cal. Apr. 28, 2025).

Equally problematic, the legislative record shows that HB25-1161 was intended to advance a controversial viewpoint unrelated to consumer health: that consumers should avoid gas appliances due to climate change. As a legislative sponsor of HB25-1161 testified, "gas appliances contribute to climate change and must be part of the conversation as we look to combat that existential crisis." (Duero Decl., Ex. A at 5:14-17.) Literature cited on the CDPHE-mandated website reinforces this viewpoint: "natural gas use in buildings and homes … is being targeted for a

reason wholly unrelated to indoor air quality: It is a fossil fuel."[1] Thus, not only is HB25-1161 scientifically unsupported, it is also a viewpoint-based speech regulation. It thus cannot survive any level of constitutional scrutiny.

Absent an injunction, AHAM's members will suffer irreparable harm by being compelled to promote the State's message in an ongoing policy debate and stigmatize their own products. Moreover, this compelled message can be changed or expanded by the State any time, without notice. The public interest would be served by protecting AHAM members' First Amendment rights while preventing scientifically unsupported, biased views from misleading consumers. AHAM respectfully requests that the Court enjoin HB25-1161 pending resolution of the merits.

## BACKGROUND

### A. THE ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

AHAM is the leading trade association of home appliance manufacturers in the U.S. and Canada, representing over 160 companies that manufacture 90% of the major, portable, and floor care appliances for sale in the U.S. (Cassady Decl., ¶ 2.) AHAM's membership includes manufacturers of gas and electric cooking products, including all major household brands. (*Id.* ¶ 3.) Many of AHAM's members sell ranges directly to consumers in Colorado through online stores, which are subject to HB25-1161's compelled speech requirements. (Compl. ¶ 10.) The home appliance industry is a significant segment of the U.S. economy, driving hundreds of billions in economic output and, in Colorado alone, contributing 12,000 jobs. (*Id.* ¶ 4.)

---

[1] Nate Seltenrich, *Clearing the Air: Gas Stove Emissions and Direct Health Effects*, Envtl. Health Perspectives 132(2):022001-02 (Feb. 28, 2024), Duero Decl., Ex. C at 2 (cited on CDPHE website, Cassady Decl., Ex. O, at Bibliography n.5.).

AHAM helps its members provide safe, sustainable, efficient products to enhance Americans' lives. One of AHAM's areas of focus is the collaborative process among regulators, independent standards organizations, manufacturers, and experts across a range of fields to develop science-backed consensus standards to promote the safety and efficiency of home appliances. (Declaration of Randy Cooper ("Cooper Decl."), ¶ 2, attached as Ex. 4.) AHAM actively works with the American Society of Heating, Refrigeration, and Air-Conditioning Engineers ("ASHRAE"), the U.S. Consumer Product Safety Commission ("CPSC"), Health Canada and the Canadian Standards Association ("CSA"), and other stakeholders to develop standards regarding cooking and indoor air quality. (*Id.* ¶¶ 4-15.)

## B. GAS STOVES POSE NO GREATER HEALTH RISKS THAN ELECTRIC RANGES

There is no scientific consensus that using gas stoves is associated with—let alone causes—any health impacts. (Declaration of Dr. Stacey Benson, Ph.D. ("Benson Decl."), ¶¶ 11-13, attached as Ex. 3.) For example, in 2024, a group of international researchers published a comprehensive review of the issue in the respected *Lancet Journal of Respiratory Medicine*. Funded by the World Health Organization ("WHO"), the researchers analyzed 116 studies to summarize the health impacts, if any, associated with or caused by cooking or heating with gas, compared to "polluting fuels" or "clean" energy.[2] They found *no significant associations* between gas cooking and respiratory conditions—even compared to cooking with electricity. (Benson Decl.,

---

[2] Puzzolo, E., et al., Estimated health effects from domestic use of gaseous fuels for cooking and heating in high-income, middle-income, and low-income countries: a systematic review and meta-analyses, Lancet Respir Med 12(4): 281-293 (2024); Benson Decl., ¶ 89 & Ex. D.

¶¶ 54, 89 & Ex. D.) Remarkably, the State's website says *nothing* about this recent, credible, evidence-based study. (Cassady Decl., Ex. O.) The same is true of other credible, evidence-based studies that contradict the State's preferred message.[3, 4, 5]

To support this motion, AHAM engaged Dr. Stacy Benson, an independent epidemiologist specializing in environmental epidemiology, respiratory protection, and clinical research, to undertake a comprehensive survey of available peer-reviewed epidemiological research evaluating gas cooking and potential health endpoints. (Benson Decl., ¶¶ 1, 3, 23.) After identifying all systematic reviews and meta-analyses on this topic, *i.e.*, studies that combine and appraise existing primary research, Dr. Benson evaluated the individual studies cited in those materials, together with additional studies identified in her own independent search. (*Id.* ¶¶ 19, 23, 42-47.) Dr. Benson identified a subset of 69 individual studies that were specific to natural gas stoves (including those that compared natural gas to electric stoves) and evaluated all health endpoints in those studies, including respiratory symptoms, cardiovascular disease, and cancer. (*Id.* ¶¶ 48-51, 58.) She then assessed the collective body of this scientific evidence using the well-established Bradford Hill Criteria.[6] (*Id.* ¶¶ 30, 60-70.) Applying the Bradford Hill criteria to the broad evidence

---

[3] Gary Wong et. al., Cooking fuels and prevalence of asthma: a global analysis of phase three of the International Study of Asthma and Allergies in Childhood (ISAAC), 1 Lancet Respir. Med., 386 (May 31, 2013); Benson Decl. ¶ 8 & Ex. G.

[4] Nigel Bruce et. al., WHO Indoor Air Quality Guidelines: Household Fuel Combustion Review 4: health effects of household air pollution (HAP) exposure, at 74 (2014) (emphasis added); Duero Decl., Ex. J.

[5] Li et. al., Gas cooking and respiratory outcomes in children: A systematic review, 5 *Global Epidemiology* 100107 (2023); Benson Decl. ¶ 89 & Ex. C.

[6] The Bradford Hill Criteria—an epidemiological method to establish a causal inference—cover a range of factors, including: (1) strength of association, (2) consistency, (3) specificity, (4) temporality, and (5) dose response. (*Id.* ¶ 26.)

available demonstrates that there is neither an association nor a causal inference between gas stove use and adverse health effects. (*Id.* ¶¶ 10-13, 70.)

As Dr. Benson testifies, these criteria demonstrate "*there is no scientific consensus* that using gas stoves for home cooking is associated with or causes any health impacts or effects." (*Id.* ¶ 10 (emphasis added).) The vast majority—over 80%—of effect estimates failed to demonstrate a statistically significant association. (*Id.* ¶¶ 60, 63.) And studies that did find an association often failed to account for confounding factors, such as second-hand smoke. More than 20 studies failed to consider *any* confounding factors, and over 10 others adjusted for three or fewer. (*Id.* ¶ 58 & Tables. 5-10.) This is critical, because confounding factors play a far more important role than gas stoves. For example, one study found tobacco smoke was responsible for *eleven times* more asthma cases than gas stoves (22% versus 2%), and dampness was responsible for *ten times* more asthma cases (20%), yet many studies failed to consider either confounding factor. (*Id.* ¶ 75.)

Thus, "the epidemiological evidence demonstrates that the risk of respiratory symptoms and diseases *are equivalent between those cooking with natural gas versus those using electricity*." (*Id.* ¶ 13 (emphasis added).) "To suggest there is a scientific consensus for such an association or causal relationship [between health impacts and gas stove] *would be scientifically inappropriate and therefore factually inaccurate*." (*Id.* ¶ 10 (emphasis added).)

## C. CLIMATE ADVOCATES RECENTLY BEGAN USING CONSUMER-HEALTH ARGUMENTS TO FURTHER DECARBONIZATION GOALS

Despite this lack of scientific consensus, environmental groups have recently sought to stigmatize gas stoves by stoking health fears to accelerate a transition to

full electrification. For example, in October 2021, the Public Interest Research Group published an article promoting a shift from gas to electric appliances because "gas stoves are a health hazard" and "cooking with gas is cooking our planet." (Declaration of Diane J. Duero ("Duero Decl."), Ex. R at 1, attached as Ex. 6.) In August 2022, the Harvard Environmental Law Review published an essay concluding:

> [B]uilding electrification advocates must tell their own story about gas stoves, and it is hard to imagine any narrative more salient than the reality of an everyday kitchen appliance that is literally poisoning our children in their own homes.

(Duero Decl., Ex. B at 19.) This "story" is disingenuous—the science does not support the notion that gas stoves are causing harm to *anyone*—let alone "poisoning" children. Nor does the science support that the health impacts of using gas stoves are any different from the health impacts of using electric stoves.

The media, without critical analysis of the science, published summaries under panic headlines. The Washington Post, in 2022, insisted "**Gas stove pollution causes 12.7% of childhood asthma**." (Duero Decl., Ex. H.) The author of the study cited by the Washington Post, however, had to clarify that the study "does not assume or estimate a causal relationship." (Duero Decl., Ex. I at 3.) Moreover, the study itself was deeply flawed. (*See* Benson Decl., ¶¶ 71-77.)

## D. UNITED STATES REGULATORS AND LEGISLATORS CONCLUDE GAS STOVES SHOULD NOT BE SINGLED OUT FOR REGULATION

Shortly after the Harvard Environmental Law Review article was published, then-Commissioner of the CPSC, Richard Trumka Jr., told Bloomberg News that gas stoves posed a "hidden hazard," adding, "Products that can't be made safe can be banned." (Duero Decl., Ex. F at 2.) Trumka's comments ignited a firestorm, with some

7

politicians insisting that regulatory action was necessary and others decrying government overreach. (Duero Decl., Exs. F and G.) The U.S. House of Representatives passed two bills, with bipartisan support, in an attempt to *prohibit* gas stoves from being singled out for federal regulation.[7]

While Trumka proposed that CPSC initiate rulemaking to regulate gas stoves, he lacked support from other commissioners and withdrew the proposal. (Duero Decl., Ex. U.) Instead, in early 2023, CPSC initiated a Request for Information concerning several topics relating to gas stove emissions. (Duero Decl., Ex. S.) Consistent with its longstanding leadership in this area and collaborative efforts to develop standards for gas stoves, AHAM submitted comments on behalf of gas and electric cooking appliance manufacturers. (Cooper Decl., ¶ 8.) Since then, CPSC reaffirmed its position that it would not seek to ban gas stoves and closed the request with no further action. (Duero Decl., Ex. D at 13.) Finally, the Government Accountability Office ("GAO") most recently recognized in 2025, while HB25-1161 was under debate, that there is "*no consensus on the health effects* of nitrogen dioxide emissions directly attributable to gas stove cooking." (*Id.* at 3.)

## E.  HB25-1161 PASSED WITHOUT ROBUST SCIENTIFIC DEBATE BUT CONSISTENT CLIMATE ATTENTION

HB25-1161 was first introduced February 3, 2025. In its initial form, the bill required a "wholesaler or supplier of a gas-fueled stove" to affix a yellow label to any

---

[7]    *See* Congressional website, https://www.congress.gov/bill/118th-congress/house-bill/1615/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D (H.R. 1615) and https://www.congress.gov/bill/118th-congress/house-bill/1640/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D (H.R. 1640).

gas stove for sale in Colorado with the message, "**THIS APPLIANCE SHOULD BE VENTILATED TO THE EXTERIOR WHEN IN USE**." (Duero Decl., Ex. K at § 25-5-1602.) Failure to do so would be deemed a "deceptive trade practice," resulting in potentially severe legal penalties. (*Id*. at § 25-5-1603.)

During HB25-1161's first committee hearing on February 19, 2025, all three non-sponsor supporting witnesses were climate advocates, including representatives of the Colorado Coalition for a Livable Climate and "a grassroots movement working to build a fossil-free future." (Duero Decl., Ex. L at 11:5-11, 14:21-23.) They made clear that decarbonization was the goal of HB25-1161:

> To effectively discourage the use of gas stoves and promote cleaner alternatives, we must take comprehensive actions, including and beyond the labeling requirements of this bill.

(*Id.* at 6:27-7:12, 7:13-8:7, 9:19-25.)

Jacob Cassady, AHAM's Director of Government Relations, testified against HB25-1161. (Cassady Decl., Ex. A & ¶ 6; Duero Decl., Ex. L at 12:21-14:17.) He explained that any label about ventilation should apply to both gas and electric ranges because there is no material difference in health risks between them. (Duero Decl., Ex. L at 13:13-17, 14:4-7.) Around March 20, Cassady contacted members of the Senate Committee on Transportation and Energy to express AHAM's concerns and request a meeting before a March 26 hearing. (Cassady Decl., ¶ 8.)

The day of the hearing, the Committee adopted a strike-below amendment, L.011, that radically changed HB25-1161. (Duero Decl., Ex. P.) First, L.011 changed the label to: "**UNDERSTAND THE AIR QUALITY IMPLICATIONS OF HAVING AN INDOOR GAS STOVE**," in bold-faced black type, followed by a link or QR code

9

to a CDPHE-controlled website. (*Id.* § 25-5-1602(1)(a).) Second, L.011 required this government website to set forth:

> information on the health impacts of gas-fueled stoves[, which] may include … links to technical studies or other resources to assist the public in understanding the health impacts of gas-fueled stoves.

(*Id.* § 25-5-1602(4).) None of the sponsors explained why the bill shifted from a label about ventilation to one about "air quality implications" and "health impacts."

At the March 26 hearing, two co-sponsors and four witnesses testified for HB25-1161, continuing to espouse climate goals. (Duero Decl., Ex. A.) For example, Senator Wallace, a co-sponsor, ended her remarks by stating, "I will just wrap up by saying that gas appliances contribute to climate change, and must be part of the conversation as we look to combat that existential crisis." (*Id.* at 5:14-17.) The past President of Colorado Communities for Climate Action was the most direct:

> *By labeling appliances with a warning, manufacturers can encourage the development and adoption of cleaner alternatives*, like electric stoves or induction cooktops, which have lower environmental impacts.

(*Id.* at 13:23-14:1 (emphasis added).)

Cassady testified on behalf of AHAM and submitted written comments. (*Id.* at 17:23-20:1; Cassady Decl., Ex. C.) He cited the GAO's recent report finding no conclusive evidence of increased asthma or other health risks when using natural gas and again expressed concern that labeling only gas stoves would mislead consumers. (Duero Decl., Ex. A at 18:21-19:23.)

On April 6, 2025, Cassady contacted all Colorado Senators, explaining that "AHAM supports appropriate and accurate science-based labels for all cooking products," but HB25-1161 was not scientifically supported. (Cassady Decl., ¶ 10 &

Ex. D.) On April 7, the Senate introduced an amendment to insert the descriptor "credible, evidence-based" before "information on the health impacts of gas-fueled stoves." (Duero Decl., Ex. T at 2:17-23.) The Senate approved the amendment and passed HB25-1161 by a vote of 19-15. (*Id*. at 4:19-20.) On April 11, 2025, HB25-1161 returned to the House floor. (Duero Decl., Ex. Q.) Representative Valdez—the original sponsor—stated that HB25-1161 "changed a bit, but it's still a good bill. It will help people avoid breathing [] harmful stuff." (*Id*. at 2:12-17.) Without further discussion, the House voted 40-22 to pass the Senate version. (*Id*. at 3:8-9, 5:15-18.)

## F. CDPHE PUBLISHED THE WEBSITE TWO DAYS BEFORE THE EFFECTIVE DATE, WITHOUT STAKEHOLDER INPUT

After HB25-1161's passage, Cassady sought meetings with the Governor's office and CDPHE, and made formal requests that the Governor veto HB25-1161. (Cassady Decl., ¶¶ 12-17.) After the Governor signed the law, AHAM and the Colorado Retail Council requested information about the content that would be included on CDPHE's planned website and asked for a stay of enforcement, but they received no substantive responses. (*Id*. ¶¶ 18-20.) On July 30, 2025, Cassady sent a letter from Kelly Mariotti, CEO of AHAM, to representatives with the Colorado Attorney General's Office and CDPHE, advising of AHAM's intention to pursue litigation challenging HB25-1161, to request a stay of enforcement, and to ask their counsel to contact AHAM's counsel. (*Id*. ¶ 21.) A representative for the Attorney General responded after 5:00 p.m. on Friday August 1, 2025, stating that "someone from our office will be in touch on Monday[,]" August 4, 2025. (*Id*. ¶ 22.)

That day, August 4, CDPHE published the website about purported "health impacts" of gas stoves, with no opportunity for public comment or stakeholder input.

(*Id.* ¶ 23.) The website is titled "**Credible, Evidence-Based Information on the Health Impacts of Gas-Fueled Stoves**." (Cassady Decl., Ex. O.) It lists serious and potentially fatal adverse health conditions, including "cancers, such as leukemia," under the heading "**Health Impacts from Indoor Air Pollution Associated with Gas Stoves**." (*Id.*) Although it contains a 17-item "bibliography" containing links to various sources, it presents only "a minority view" of the available scientific literature and "omits the majority view found in the scientific evidence" that Dr. Benson reviewed. (Benson Decl., ¶ 24.) The website also links to "information provided by other state governments for consistency" (Cassady Decl., Ex. O), although none of those other state governments require gas stove retailers and manufacturers to themselves distribute this type of one-sided, misleading information to consumers.

Contrary to its title, CDPHE's website does not present "Credible, Evidence-Based Information on the Health Impacts of Gas-Fueled Stoves." First, the website provides no "epidemiological evidence regarding health effects associated with natural gas cooking." (Supplemental Declaration of Dr. Stacey Benson, Ph.D. ("Benson Supp."), ¶ 3, attached as Ex. 7.) It does not mention a single epidemiological study about the health effects of gas stoves, even though nearly 70 such studies have been published, and even though the overwhelming majority detail the *absence* of statistically significant associations or causal relationships between gas stoves and adverse health effects. (Benson Decl., ¶¶ 10-12, 60 & Table 11.) Indeed, the CDPHE website entirely ignores that the scientific evidence "demonstrates that the risk of respiratory symptoms and diseases are equivalent between those cooking with natural gas versus those using electricity." (*Id.* ¶ 13.)

Second, most sources the website cites are not about gas stoves at all—they contain only "broad overviews of the potential health risk associated with constituents that might be found in trace quantities in natural gas cooking emissions." (Benson Supp., ¶ 5.) Those sources "fail to put exposures associated with the development of specific health effects (e.g. cancer) into context with those experienced during gas cooking." (*Id.*) And even those sources are equivocal. For example, one source, an EPA website, recognizes that "[w]hile pollutants commonly found in indoor air can cause many harmful effects, there is considerable uncertainty about what concentrations or periods of exposure are necessary to produce specific health problems." (*Id.* ¶ 58.)

Third, the website misleadingly reports health effects associated with *occupational* exposures to benzene, formaldehyde, and other chemicals, without any evidence that these health effects are associated with the far smaller level of potential exposure from *residential* gas cooking. (*Id.* ¶¶ 49-52.)

Fourth, the only two scientific studies cited on the website—which are not epidemiological studies and provide no "evidence regarding health effects associated with natural gas cooking"—fail to provide credible information about the health impacts of *new* gas stoves, the sole subject of HB25-1161. (*Id.* ¶¶ 3, 6.) In both studies, emissions were dominated by a small subset of stoves, including old stoves with pilot lights, which have not been sold in the United States since 2012, nearly 15 years ago. (*Id.* ¶¶ 8, 12-13, 17-18.) Worse, those studies relied on observations about conditions that do not reflect typical home gas-stove use. (*Id.* ¶¶ 9-14, 33-44.) For example, one study relied on a model that was misleadingly based on the top 5% of benzene-

emitting stoves—and still found a cancer risk only if such stoves were used *more than 6 hours every day in an unvented apartment*, although more than 90% of consumers use their stove *less than 73 minutes per day*. (*Id.* ¶¶ 15, 35-43.) The study—based on these "excessive" and "extreme" assumptions—"fails to inform on the potential health effects associated with use of natural gas stoves." (*Id.* ¶ 44.f.)

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must establish (1) a "substantial likelihood" of success on the merits; (2) a likelihood of "irreparable harm"; (3) that the "threatened harm outweighs the harm a preliminary injunction may pose to the opposing party"; and (4) that the injunction "will not adversely affect the public interest." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "'merge' when, like here, the government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## ARGUMENT

HB25-1161 compels AHAM's members to disseminate a message about purported "air quality implications" and "health impacts" of gas stoves—including that consumers could contract diseases such as leukemia—that are divorced from scientific consensus. The research does not support either the statement that there are "health impacts" of "having an indoor gas stove" or the suggestion that any such "impacts" differ from those associated with electric stoves. As Dr. Benson testifies, "*there is no scientific consensus* that using gas stoves for home cooking is associated with or causes any health impacts or effects." (Benson Decl., ¶ 10.) Because

14

consumers have no way to discern this fact from the label or website AHAM's members are forced to disseminate to every potential purchaser of gas stoves in Colorado, consumers will almost certainly be misled by HB25-1161's biased, scientifically unsupported content. As Dr. Benson explains, "the CDPHE website only provides a minority view and omits the majority view found in the scientific evidence set out in the literature." (*Id.* ¶ 24.)

This is perhaps unsurprising, because, in truth, HB25-1161 has nothing to do with consumer health; it is an attempt to compel AHAM's members to take sides in an ongoing, unrelated policy debate about climate change and decarbonization. While that policy debate may deserve close public attention, the State cannot force anyone to participate in it. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (prohibiting government-compelled speech is a core function of the First Amendment). Nor can the State force anyone to propagate any particular viewpoint on the subject. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (viewpoint-based speech laws are an "egregious" First Amendment violation). Yet, unless AHAM's members enter this debate by disseminating a misleading label and the State's website content, which can be changed or expanded at any time, HB25-1161 exposes them to severe consequences—branding them as engaging in "a deceptive trade practice" and subjecting them to potential civil lawsuits (including class actions) and government enforcement that could result in damages and penalties. Colo. Rev. Stat. §§ 6-1-110, -112(b) -113. HB25-1161 is not a science-based consumer health regulation; it is a viewpoint-based speech compulsion. AHAM is therefore likely to succeed on its First Amendment claim, regardless of the level of scrutiny applied.

Given the violation of AHAM's members' First Amendment rights, the remaining equitable factors likewise support injunctive relief.

## I. AHAM IS LIKELY TO SUCCEED ON ITS FIRST AMENDMENT CLAIM.

HB25-1161 violates fundamental, well-established First Amendment principles. Because the law forces AHAM's members to take a position in an ongoing policy debate on a topic unrelated to consumer health, it is a viewpoint-based speech compulsion and thus "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). It is subject, at minimum, to strict scrutiny. Because the State—which bears the burden of proof—cannot justify HB25-1161 under this exacting standard, it must be enjoined. Indeed, HB25-1161's compelled speech cannot be justified under *any* level of constitutional scrutiny, because it is neither purely factual nor uncontroversial. The Central District of California recently analyzed this same issue and found that similar compelled speech would be unconstitutional. *Hedrick*, 2025 WL 1238363, at *6.

### A. HB25-1161 Compels Participation in an Ongoing Debate Unrelated to Consumer Health.

HB25-1161 is starkly different from typical consumer warning laws. It includes no legislative findings, it identifies no particular health concerns, and it says nothing about potential mitigation measures. It instead mandates a misleading label and requires CDPHE to create a biased, inaccurate website, without any public input, that is contrary to scientific consensus. Just as concerning, the website may change over time, possibly in radical ways, without stakeholder involvement or even notice. By contrast, traditional consumer warnings are specific, concrete, and supported by

documented legislative findings.[8] All of these features are notably absent from HB25-1161, confirming that HB25-1161 lacks scientific support and is pretextual.

Despite decades of research, the science, at best, lacks consensus regarding *associations* between health impacts and indoor gas-fueled cooking. (Benson Decl., ¶¶ 10-11.) More importantly, there is no scientific basis at all for any *causal* relationship between cooking with gas and consumer health. (*Id.* ¶¶ 10, 12.) "To suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate." (*Id.* ¶ 10.)

It is perhaps not surprising, then, that the legislative history of HB25-1161 makes clear that "health impacts" are not what animated its compelled speech requirements. The law—like other recent, failed regulatory proposals singling out gas stoves—was instead motivated by separate concerns about climate change and decarbonization. (*See supra* Section E, at 17-23.) HB25-1161 was originally drafted to warn consumers about the need to use ventilation (Duero Decl., Ex. K), which AHAM opposed as unnecessary (because existing standards already ensure gas stove use is safe) and misleading (because cooking food generates certain emissions regardless of fuel source). (Duero Decl., Ex. L at 14:4-10.)

HB25-1161, however, was abruptly rewritten to focus exclusively on the purported "health impacts of gas-fueled stoves," eliminating any reference to ventilation. (Duero Decl., Ex. P.) Although the bill's sponsors never explained this drastic change, the record makes clear that the goal was to disincentivize consumers

---

[8] *E.g.*, 2023 Colo. Sess. Laws 2134 (making various declarations about Radon, including, "Radon is the leading cause of lung cancer in nonsmokers and the second leading cause of all lung cancer," and mandating a specific consumer disclosure that "strongly recommends" testing and, if necessary, mitigation).

from purchasing gas stoves to advance decarbonization as a means of addressing climate change. One sponsor admitted that the bill was motivated in part by the "existential crisis" of climate change—even though nothing in the bill's text has any tie to that subject. (Duero Decl., Ex. A at 5:14-17.) During legislative hearings, all non-sponsor supporting witnesses were climate change advocates. (*See supra* Section E, at 17-23.) Concerns about the climate, while certainly worthy of public debate, have nothing to do with indoor air quality or the health effects of gas-fueled stoves. Consumer health was thus used as a pretext to single out gas-fueled stoves for a compelled-speech regulation that lacks any scientific basis.

A core function of the First Amendment is to "prohibit[ ] the government from telling people what they must say." *Rumsfeld*, 547 U.S. at 61. Laws that "target speech based on its communicative content" "are presumptively unconstitutional" and subject to strict scrutiny. *Reed*, 576 U.S. at 163. Even more "egregious" is "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 168-69 (quoting *Rosenberger*, 515 U.S. at 829). "Indeed, there is an argument that such regulations are unconstitutional per se." *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020). At minimum, "[v]iewpoint-based restrictions receive even more critical judicial treatment" than strict scrutiny. *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279-80 (10th Cir. 1996) (quotation omitted).

HB25-1161 compels speech on the basis of viewpoint. Motivated by the debate concerning climate change, the State enacted HB25-1161 to compel sellers of gas stoves to disseminate scientifically unsupported information about purported "health

impacts" that the State hopes will dissuade consumers from buying them. (*See* Duero Decl., Ex. A at 5:14-17.) HB25-1161 thus compels manufacturers and retailers to stigmatize their own products while expressing the State's view as to two ideological debates: (1) that using gas stoves "contribute[s] to climate change" and (2) that, to promote decarbonization, consumers should be dissuaded from purchasing gas-fueled stoves. (*See id.*) The First Amendment does not permit the State to require AHAM's members to propagate the State's view on these issues. HB25-1161 is, "in practice, viewpoint discriminatory," and this is "all but dispositive" of its unconstitutionality. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

### B.    The State Cannot Sustain Its Burden of Establishing HB25-1161 Is Narrowly Tailored to Promote a Compelling State Interest.

Strict scrutiny—"the most demanding test known to constitutional law"— requires the State to prove that a speech regulation is "the least restrictive means of achieving a compelling governmental interest." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). Throughout its history, the Supreme Court has "only once [held] that a law triggered but satisfied strict scrutiny." *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-39 (2010)). The State cannot meet its burden to satisfy this stringent test here.

HB25-1161 does not serve the only potential government interest it implicates—protection of consumer health. First, any health justification is pretextual and irrelevant. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 766 (2002) (holding that the Court need not decide whether an asserted interest is compelling "because, … the Court does not believe it was adopted for that purpose"). The legislative history makes clear that consumer health is not actually the aim of

the law. If it were, HB25-1161 would warn consumers to ensure adequate ventilation, as originally drafted, and require warnings for *all* stoves, not just gas stoves. HB25-1161 does not do so, because its true purpose is ideological—to dissuade consumers from purchasing gas stoves as a means of addressing an unrelated policy concern, climate change and decarbonization. (*See* supra Section E, at 17-23.) That interest is viewpoint-based and, by definition, not compelling. *Church on the Rock*, 84 F.3d at 1280 (holding that "no government entity may permissibly control the viewpoint being expressed" but rather should use its own funds "to convey its own message").

Second, any purported interest in consumer health cannot be compelling because HB25-1161 does not "identify an actual concrete problem." *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012) (quotation omitted); *see also Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 169 (2002) (no compelling interest in the "absence of any evidence of a special crime problem related to [the regulation on speech]"). Here, scientific consensus does not support the State's contention that gas stoves have "health impacts": there is no *association*—let alone a *cause-and-effect* relationship—between gas cooking and health impacts. (Benson Decl., ¶¶ 10-12.) Thus, HB25-1161 rests on "[m]ere speculation of harm" which "does not constitute a compelling state interest." *Awad*, 670 F.3d at 1129.

Nor can the State establish that HB25-1161 is "narrowly tailored" to achieving any interest in consumer health. Because the most potentially significant byproducts of gas cooking result from the cooking of the food (rather than from the fuel source itself), the risk of harm, if any, posed by cooking with gas is equivalent to the risk of harm posed by cooking with electricity. (Benson Decl., ¶ 13.) HB25-1161, which

singles out gas stoves for its compelled disclosure, thus is "woefully underinclusive." *Republican Party of Minnesota*, 536 U.S. at 780. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). That is particularly true when, as here, the government relies on flawed studies that fail to prove a causal relationship between the targeted activity (use of gas stoves) and identified "harm" (consumer health). *Id.* at 800 (disregarding flawed studies based on "correlation, not evidence of causation").

Moreover, HB25-1161's compelled disclosures are not the least restrictive means for advancing any interest the State may articulate. There is no indication the State tried—or even considered—less burdensome alternatives, such as the State itself promoting and disseminating the website, rather than forcing private parties to. That is exactly what other states have done—as the HB25-1161-mandated website illustrates. (*See* Cassady Decl., Ex. O at 3 (citing state websites from Washington, Minnesota, California, and Illinois).) HB25-1161, in an unprecedented step, forces AHAM's members to *themselves* endorse and carry the state-mandated message directly to every potential purchaser of gas stoves in Colorado. Moreover, rather than compelling AHAM's members to provide consumers a specific, targeted message to advance a well-defined compelling interest, HB25-1161 mandates that they promote both a misleading label and an entire government website (with links to third-party sites) containing information that is severely biased, scientifically inaccurate, and subject to change any time. HB25-1161 thus unconstitutionally compels "substantially more speech than is necessary to further the government's legitimate

interests," to the extent any such interest exists. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

The State cannot satisfy its burden of establishing that HB25-1161 is narrowly tailored to achieve a compelling interest. The law fails strict scrutiny.

### C. Neither of the Narrow Exceptions to Strict Scrutiny for Commercial Speech Apply to HB25-1161.

Two "narrow and well-understood" exceptions to strict scrutiny apply in the context of "commercial speech." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). First, as the Supreme Court articulated in *Central Hudson*, "'intermediate' scrutiny" applies to "restrictions on commercial speech." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)). Second, in limited situations, regulations that "impose a disclosure requirement rather than an affirmative limitation on speech" can be subject to "less exacting scrutiny" under the Supreme Court's holding in *Zauderer*. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (citing *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)). Neither "narrow" exception applies here.

### 1. *Central Hudson* Does Not Apply Because HB25-1161 Does Not *Restrict* "Commercial Speech."

The Supreme Court's *Central Hudson* framework does not apply to HB25-1161 for two reasons. First, HB25-1161 is not speech *restriction*, but a speech *compulsion*. The Supreme Court has "strongly suggested" that "*Central Hudson* scrutiny is not appropriate in a case involving compelled speech rather than restrictions on speech." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 580 n.10 (2005) (Souter, J.,

dissenting) (citing *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) and *United States v. United Foods, Inc.*, 533 U.S. 405 (2001)). Judges in this District have recognized the distinction. *All. of Health Care Sharing Ministries v. Conway*, No. 24-CV-01386-GPG-STV, 2025 WL 315389, at *28 (D. Colo. Jan. 13, 2025) (explaining that "laws *restricting* commercial speech" fall under *Central Hudson* while "laws that *compel* commercial speech" fall under *Zauderer*). Given the nature of HB25-1161 as a law that compels speech, *Central Hudson* is not the appropriate framework.

Second, HB25-1161's mandated disclosures do not qualify as "commercial" speech. "[*T*]*he test* for identifying commercial speech" is whether the speech amounts to merely "the proposal of a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 473-74 (1989)). "[C]ommercial speech is best understood as speech that merely advertises a product or service for business purposes." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). HB25-1161's labeling requirement, which compels retailers and manufacturers to endorse and propagate a State website disconnected from any specific product or any proposed commercial transaction, neither proposes a transaction nor advertises a product.

> ## 2. *Zauderer* does not apply because HB25-1161 does not compel commercial speech or regulate advertising, and compels non-factual and highly controversial speech.

In *Zauderer*, the Supreme Court considered the constitutionality of a law that regulated "purely commercial speech"; more specifically, state-compelled speech directed at "prevent[ing] potential deception of the public" by requiring certain disclosures in a lawyer's voluntary advertising. 471 U.S. at 629. In that limited

context, the Court found that commercial "disclosure requirements [need only be] reasonably related to the State's interest in preventing deception of consumers," so long as the disclosure is "purely factual and uncontroversial." *Id.* at 651. This narrow exception to the baseline rule of strict scrutiny does not apply to HB25-1161.

First, as explained above, HB25-1161 is not a regulation of "purely commercial speech" and thus *Zauderer* is irrelevant. 471 U.S. at 629.

Second, for *Zauderer* to apply, the law must require an *additional* disclosure that accompanies a *voluntary advertisement. See id.*; *United Foods*, 533 U.S. at 416 (distinguishing *Zauderer* because regulation was not "necessary to make voluntary advertisements nonmisleading"). Because HB25-1161 compels speech "unrelated to the interest in avoiding misleading or incomplete commercial messages," *Glickman*, 521 U.S. at 491 (Souter, J., dissenting), *Zauderer* is inapplicable.

Third, to qualify for *Zauderer* scrutiny, the compelled disclosure must be limited to "purely factual and uncontroversial information." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018). The HB25-1161 disclosure—which requires AHAM's members to disclose information regarding purported "air quality implications" and "health impacts" of gas stoves—satisfies neither requirement.

Although "[i]nformation that is purely factual is necessarily 'factually accurate,' … that alone is not enough to qualify for the *Zauderer* exception." *Nat'l Ass'n of Wheat Growers v. Bonta* ("*Wheat Growers*"), 85 F.4th 1263, 1276 (9th Cir. 2023). "[A] statement may be literally true but nonetheless misleading and, in that sense, untrue." *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 847 (9th Cir. 2019). Thus, even where a proposed disclosure is "entirely and literally true,"

that is insufficient when the disclosure relates to purported health risks subject to "a legitimately unresolved scientific debate." *Wheat Growers*, 85 F.4th at 1279.

The HB25-1161-mandated website includes information expressly stating that gas stoves are "associated with" severe consumer "health risks." Yet, "[b]ased on established scientific principles, there is no scientific consensus that using gas stoves for home cooking is associated with or causes any health impacts or effects." (Benson Decl., ¶ 10.) There is no scientific consensus that gas cooking is associated with negative birth outcomes, cancer, or cardiovascular disease. (*Id.* ¶¶ 49-15.) And the "risk of respiratory symptoms and diseases are equivalent between those cooking with natural gas versus those using electricity or clean fuels." (*Id.* ¶¶ 13, 52-54.) "To suggest there is a scientific consensus for such an association or causal relationship would be scientifically inappropriate and therefore factually inaccurate." (*Id.* ¶ 10.) Indeed, regulators in the U.S. have examined the same issue and either closed their work on the matter with no action or came to the same general conclusion as AHAM's expert witness. (*Supra.* § D.) Thus, *at most*, the content of the HB25-1161 label and website is the subject of an ongoing, unresolved debate. Yet the website does not even inform consumers of that debate. Instead, it "only provides a minority view and omits the majority view found in the scientific evidence." (*Id.* ¶ 24.) *Cf. Wheat Growers*, 85 F.4th at 1281 (rejecting "factually true" warning that prompted conflicting conclusions from regulators). The HB25-1161 disclosure thus is not "purely factual."

Separately, HB25-1161's disclosure regarding the purported "health impacts" of gas stoves is "controversial." "[A] compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith

scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd*, 145 S. Ct. 2291 (2025); *see also R J Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 881 (5th Cir. 2024). When there is "robust disagreement by reputable scientific sources," compelling the seller of a product to warn of those dangers is objectively controversial. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). "From the standpoint of an average consumer, saying that something … has serious deleterious health effects—without a strong scientific consensus that it does—remains controversial." *Wheat Growers*, 85 F.4th at 1278.

Because there is no "scientific consensus" that using gas stoves is associated with—let alone causes—any health impacts (Benson Decl., ¶ 10), the HB25-1161 disclosure "is undeniably controversial from an objective scientific standpoint." *Wheat Growers,* 85 F.4th at 1278; *cf. Cal. Chamber of Com.*, 29 F.4th at 478 (finding warning controversial where organizations disagreed about whether chemical was "likely to be carcinogenic to humans"). HB25-1161 is also *subjectively* controversial, because it forces regulated parties "'to convey a message fundamentally at odds' with their businesses." *Wheat Growers*, 85 F.4th at 1278 (quoting *CTIA*, 928 F.3d at 845). Finally, HB25-1161 is controversial because it requires affected sellers to take "sides in a heated political controversy"—the ongoing debate surrounding climate change and decarbonization. *CTIA*, 928 F.3d at 845.

The "genuine, scientific controversy" regarding whether gas stoves are associated with any health impacts "is sufficient to place [the HB25-1161 disclosure]

outside the realm of the lower level of review under *Zauderer*." *Wheat Growers*, 85 F.4th at 1282. A few months ago, a judge in the Central District of California reached this exact conclusion. In an order dismissing putative class actions against AHAM members for an alleged failure to disclose the risks of cooking with gas, the judge explained, after evaluating the state of the science, that the plaintiffs' claims "would be barred by the First Amendment," because "there is no scientific consensus regarding [the alleged] health risks." *Hedrick*, 2025 WL 1238363, at *6.

### D. Regardless, HB25-1161 Cannot Withstand Intermediate Scrutiny under *Central Hudson* or the Standards of *Zauderer*.

#### 1. The State Cannot Satisfy *Central Hudson*.

Under *Central Hudson*, regulation of commercial speech is constitutional only if the State proves: "(1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary." *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1233 (10th Cir. 1999). The party defending the regulation—here, the State— must satisfy "the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

Here, for the same reason the State cannot demonstrate a *compelling* interest, it cannot prove a *substantial* interest: the purported interest in the "air quality implications" and "health impacts" of gas stoves is pretextual and, given the lack of scientific support, speculative. "[A] state may not regulate commercial speech on the back of controverted evidence." *Wheat Growers*, 85 F.4th at 1282. HB25-1161 improperly seeks to compel speech "to prevent something that does not appear to occur"—health impacts from cooking with gas. *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117-18 (9th Cir. 2023). There is thus no State interest—compelling,

27

substantial, or otherwise—that could support the constitutionality of HB25-1161.

Given that there is no support for the contention that cooking with gas causes any "health impacts" (Benson Decl., ¶ 10), it is axiomatic that HB25-1161 cannot "directly and materially advance" the State's purported interest in preventing them. Nor can the State "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *U.S. West, Inc.*, 182 F.3d at 1237 (quoting *Edenfield*, 507 U.S. at 771). Even if the State were able to establish that it has a valid health interest, "compelling [AHAM's members] to warn consumers of a potential [health impact] never confirmed by any regulatory body—or of a hazard not 'known' to more than a small subset of the scientific community—does not directly advance that interest." *Wheat Growers*, 85 F.4th at 1283; *Free Speech Coal., Inc.*, 95 F.4th at 284. Indeed, "the fact that science is evolving is all the more reason to provide robust First Amendment protections." *Wheat Growers*, 85 F.4th at 1283.

Finally, the State cannot show that HB25-1161 "is no more extensive than necessary" under *Central Hudson*. Where, as here, the government forces disclosure of purported health impacts that are the subject of unresolved scientific debate, the government has sufficient other means to promote its view that the product may "put[] humans at risk . . . 'without burdening [the sellers] with unwanted speech.'" *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 757). For example, the government "could reasonably post information about [the purported health risks] on its own website or conduct an advertising campaign"—neither of which would "co-opt [the sellers] to deliver its message for it." *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 757). Indeed, that is exactly what other states have done.

### 2. HB25-1161 Fails *Zauderer* Scrutiny.

HB25-1161 also fails under *Zauderer*, because "[e]ven under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651). Because, as explained above, the State's purported interest is pretextual and speculative, the State cannot demonstrate that HB25-1161 would "remedy a harm that is potentially real, not purely hypothetical." *Id.*

Nor, for the reasons above, can the State prove HB25-1161 "extend[s] no broader than reasonably necessary." *Id.* The State cannot show HB25-1161 disclosure would have the desired effect on consumers (assuming the State desires the law have any permissible effect) or that it is sufficiently tailored to the State's interest. Instead, HB25-1161 "imposes a government-scripted, speaker-based disclosure requirement that is wholly disconnected from [the State's] informational interest." *Id.* at 777. Indeed, the legislators who advocated for and passed HB25-1161 did not even know what content the website would include or to which outside sources it would cite.

## II.  THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION.

Because AHAM has shown it is likely to succeed on its First Amendment claim and, thus, its members' First Amendment rights will be infringed absent a preliminary injunction, the remaining factors also weigh in favor of injunctive relief. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor.") (quotation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Furthermore, the message HB25-1161

compels AHAM's members to promote will mislead consumers and stigmatize AHAM members' products. This is plainly irreparable injury. *See Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1272 (10th Cir. 2022) (finding irreparable injury based upon risk of harm to "reputation and goodwill").

"[W]hen [a] law . . . is likely unconstitutional, the[ ] interests [of those the government represents, such as voters] do not outweigh [a plaintiff's interest] in having [its] constitutional rights protected." *Hobby Lobby Stores, Inc.*, 723 F.3d at 1145 (quoting *Awad*, 670 F.3d at 1131-32 (modifications in original).) As explained above, the State has not offered any legitimate interest for HB25-1161. But putting that aside, even "undeniably admirable goals" of the State "must yield when they collide with the . . . Constitution." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (quotations omitted). Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc.*, 723 F.3d at 1145 (quoting *Awad*, 670 F.3d at 1132). The public interest also "is served by preventing consumer confusion in the marketplace." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001). HB25-1161 would create confusion in the marketplace by requiring sellers to warn consumers and direct them to information that would misinform them about the purported health impacts of gas stoves and mislead them into thinking that gas stoves are more dangerous than electric stoves.

## CONCLUSION

The Court should grant a preliminary injunction prohibiting Defendants from implementing and enforcing HB25-1161.

Dated: August 19, 2025                Respectfully submitted,

_s/ Frederick R. Yarger_

Frederick R. Yarger
Andrew M. Unthank
Herman J. Hoying
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:   yarger@wtotrial.com
          unthank@wtotrial.com
          hoying@wtotrial.com

_Attorneys for Plaintiff Association of Home
Appliance Manufacturers_

## CERTIFICATION PURSUANT TO
## LOCAL RULE 7.1(a)

Counsel for AHAM spoke with counsel for Defendants and conferred with them by email on several occasions concerning this motion during the weeks of August 4 and August 11. These conferrals led to the filing of the parties' Joint Motion to Set Briefing Schedule and Hearing and Stipulation to Temporarily Stay Enforcement (ECF No. 25), and this Court's order granting that joint motion (ECF No. 26). As those filings reflect, Defendants oppose this motion but agreed to temporarily stay enforcement of HB25-1161 until this motion is decided.

## CERTIFICATION REGARDING
## THE USE OF GENERATIVE AI

Counsel for AHAM certifies that no portion of this filing was drafted by AI.

## **CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on August 19, 2025, I electronically filed the

foregoing **MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following

email addresses:

- **Michael Landis**
  michael.landis@coag.gov

- **Peter G. Baumann**
  peter.baumann@coag.gov


*s/ Christine Keitlen*
Christine Keitlen