# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02417-SKC-KAS

ASSOCIATION OF HOME APPLIANCE MANUFACTURERS,

     Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado Department of Public
 Health & Environment (CDPHE), in her official capacity;
JEFF LAWRENCE, Director of the Environmental Health and Sustainability
 Division of the CDPHE, in his official capacity; and
PHIL WEISER, Colorado Attorney General, in his official capacity,

     Defendants.

---

## DEFENDANTS' OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

---

For the past several years, the Colorado General Assembly has exercised its police power to protect the public health, safety, and welfare to raise awareness and promote improved air quality, focusing in particular on education and protection for the public health of Coloradans exposed to multiple pollutants. In 2021, the General Assembly adopted House Bills 21-1266 (amending § 25-7-114.4(5), C.R.S. (2025)) and 21-1189 (creating § 25-7-141, C.R.S.), which directed more study of, and protections from, certain air pollutants, including oxides of nitrogen, particulate matter, and benzene. In 2022, the legislature passed House Bill 22-1244, directing the Colorado Department of Public Health and Environment ("CDPHE") to create a comprehensive monitoring, reporting, and emission reduction program for a broader suite of air toxics. In January 2025, in furtherance of this effort, CDPHE identified benzene and formaldehyde as two of the first five "priority toxic air contaminants" for Colorado. 5 Code Colo. Regs. 1001-34. These statutory directives focused largely on outdoor, or "ambient," air quality.

Consistent with these efforts, last session the General Assembly took steps to address indoor air quality concerns, including through legislation designed to raise awareness of the risks posed by poorly ventilated gas stoves. But rather than directly regulating those stoves, or requiring manufacturers to directly disclose the potential harms, Colorado adopted a light-touch approach. Colorado requires all new gas stoves offered for sale in Colorado to include a generic label and link to a website containing factual, noncontroversial, evidence-based information. § 25-5-1602(1), (3), C.R.S. (the "Labeling Requirement"). The website does not discourage consumers from buying gas stoves or allege that gas stoves cause health problems. Instead, it outlines the common-sense consensus that gas stoves have the potential to contribute to indoor air pollution and should be well-ventilated.

For years, the Association of Home Appliance Manufacturers and its members have been open about the potential health impacts of indoor air pollution. Specifically, AHAM and its members have time and again acknowledged the potential cumulative risks associated with indoor air pollution, including from gas stoves, and they have reinforced the importance of adequate ventilation to mitigate those risks when cooking. Now, changing its tune after years of supporting ventilation education, AHAM challenges the General Assembly's low-impact approach as interfering with its members' free speech.

Because Colorado's Labeling Requirement is far milder than the types of health and safety warnings that have long been upheld; because AHAM's members retain the full panoply of free speech rights to communicate information they contend is absent from the state-branded website; and because those same members themselves already make similar or even more intrusive warnings related to air quality, AHAM is unlikely to succeed on the merits of its claim. The Motion for a Preliminary Injunction (Dkt. 27) ("Mot.") should be denied.

## FACTUAL BACKGROUND

### I.    Indoor air quality is a public health concern.

On average, people spend approximately 90% of their time indoors, but "a growing body of scientific evidence has indicated that the air within homes . . . can be more seriously polluted than the outdoor air in even the largest and most industrialized cities." Ex. B at 2.[1] The people most susceptible to the effects of

---

[1] Modeled after the Court's rules for trial exhibits, Defendants' exhibits are "marked using letters A through Z, then using A-9 through A-99." Crews Standing Civil Order, § 7.b.i. To "avoid duplicate exhibits," *id.* Defendants cite to exhibits attached to Plaintiff's Motion where possible, using the ECF Docket Number to do so, *e.g.*, Ex. D to Duero Decl. (Dkt. 27-31).

indoor air pollution are often people who spend the most time indoors—the young, the elderly, and the chronically ill, including those suffering from respiratory or cardiovascular diseases. *See id.*

The "primary cause" of residential indoor air quality problems are pollution sources "that release gases or particles into the air." *Id.* at 3; Ex. A at 2. One such source of indoor air pollution is gas stoves. *See* Ex. B at 19; Ex. A at 2.

Because gas stoves burn natural gas or propane, Ex. H at 3, they release certain indoor air pollutants, including particulate matter, nitrogen dioxide, carbon monoxide, benzene, and formaldehyde. *See* Ex. D to Duero Decl. (Dkt. 27-31) at 2 & n.2, 3 (note); Ex. B at 19-21; Ex. T at 12; Ex. H at 3; Ex. J at 1; Ex. K at 2; Ex. L at 1; Ex. M at 1. No one credibly contests that these pollutants, in certain concentrations and over periods of exposure, can be harmful.

### A. Particulate Matter

Particulate matter ("PM") is the "general term for a mixture of solid and liquid droplets suspended in the air." Ex. Q at 1. PM is classified according to its size. $PM_{2.5}$ are "fine particles" with diameters that are 2.5 micrometers and smaller. *Id.* at 2. "Ultrafine particles" are PM with diameters less than 0.1 micrometers. *See id.* PM smaller than 10 micrometers are classified by the United States Environmental Protection Agency ("EPA") as "criteria air pollutants," which means EPA is required to regulate sources of PM pollution affecting ambient air to protect public health and welfare. 42 U.S.C. § 7409, 7411.

The size of PM is "directly linked to their potential for causing health problems." Ex. R at 1. According to AHAM, $PM_{2.5}$ and smaller "poses the greatest risk to health" and is "by far the most significant cause of harmful indoor air

quality." Ex. H to Cassady Decl. (Dkt. 27-19) at 3. PM of this size "can get deep into your lungs, and some may even get into your bloodstream." Ex. R at 1.

According to EPA, "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including: premature death in people with heart or lung disease; nonfatal heart attacks; irregular heartbeat; aggravated asthma; decreased lung function; increased respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing." *Id.* EPA has similarly identified groups vulnerable to ambient $PM_{2.5}$ pollution as many of the same groups discussed above as more vulnerable to the effect of indoor air pollution. *See* 89 Fed. Reg. 16202, 16234-36 (Mar. 6, 2024) (lowering the acceptable ambient standard for $PM_{2.5}$ to better protect public health).

According to EPA, PM is a "major pollutant" emitted from gas stoves. Dkt. 27-31 at 2 n.2. "Gas stove cooking produces particulate matter through the combustion process as well as some cooking processes (such as pan frying)." *Id.* at 3 (note). This includes the most impactful sizes of PM because "gas stoves emit ultrafine particulate matter (airborne particles with a diameter of 0.1 micrometers or less) from the combustion process" itself. *Id.* at 3.

**B. Nitrogen Dioxide ("$NO_2$")**

"Nitrogen dioxide is a reddish brown, irritating odor gas that irritates the mucous membranes in the eye, nose and throat and causes shortness of breath after exposure to high concentrations." Ex. I at 2; *see also* Ex. B at 20; Ex. A to Suppl. Benson Decl. (Dkt. 27-51) at 2; Ex. J at 2. Like PM, $NO_2$ is a criteria air pollutant, strictly regulated by EPA for its impact on ambient air and public health. *See, e.g.*, 40 C.F.R. Part 60, Subparts D, JA, GG. Breathing air with a high concentration of $NO_2$ over short periods "can aggravate respiratory diseases, particularly asthma[.]"

Ex. P at 1. EPA has recognized the impact of short-term exposures of NO$_2$ on asthma for both indoor and ambient exposure. *See* 83 Fed. Reg. 17226, 17233-35 (April 18, 2018). There is evidence that "high concentrations or continued exposure to low levels of nitrogen dioxide" increases "the risk of respiratory infection" and, based on animal studies, "may lead, or contribute, to the development of lung disease such as emphysema." Ex. I at 2-3; *see also* Ex. B at 48; Ex. J at 2. "Longer exposures to elevated concentrations of NO$_2$ may contribute to the development of asthma and potentially increase susceptibility to respiratory infections." Ex. P at 1.

According to EPA, nitrogen dioxide is a "major pollutant" emitted from gas stoves. Dkt. 27-31 at 2 n.2; Ex. I at 1; Ex. B at 19-20. "Studies have found that nitrogen dioxide emissions from gas stoves can exceed the 1-hour exposure limits set by EPA for outdoor air and recommended by the World Health Organization for both indoor and outdoor air." Dkt. 27-31 at 2 & n.3 (citing studies); *see also* Dkt. 27-51 at 2; Ex. H at 4. Evidence suggests that NO$_2$ emissions are linearly related to the amount of natural gas burned and can surpass standards "within a few minutes of stove usage, particularly in smaller kitchens." Dkt. 27-51 at 1.

**C. Carbon Monoxide ("CO")**

Carbon monoxide is a colorless, odorless gas that "interferes with the delivery of oxygen throughout the body." Ex. I at 2; Ex. B at 20. Like PM and NO$_2$, CO is a criteria air pollutant strictly regulated by EPA. *See, e.g.*, 40 C.F.R. Part 60, Subparts J, JJJJ. Because it is impossible to see or smell, carbon monoxide "can kill you before you are aware it is in your home." Ex. K at 2. "Hundreds of people die accidentally every year from CO poisoning caused by malfunctioning or improperly used fuel-burning appliances." Ex. O at 2.

"The effects of CO exposure can vary greatly from person to person depending on age, overall health and the concentration and length of exposure." Ex. K at 2. At low concentrations, carbon monoxide can cause "fatigue in healthy people" and "chest pain in people with heart disease." *Id*. at 3. At high concentrations, carbon monoxide "can cause a range of symptoms, including: headaches; dizziness; weakness; nausea; confusion; disorientation; fatigue in healthy people; episodes of increased chest pain in people with chronic heart disease." Ex. I at 2; *see also* Ex. B at 20; Ex. K at 3-4.

According to EPA, carbon monoxide is a "major pollutant" emitted from gas stoves. Dkt. 27-31 at 2 n.2; Ex. I at 1; Ex. B at 19-20. "Average levels in homes without gas stoves vary from 0.5 to 5 parts per million (ppm). Levels near properly adjusted gas stoves are often 5 to 15 ppm and those near poorly adjusted stoves may be 30 ppm or higher." Ex. K at 4. In other words, "if gas stoves are not working properly or are used incorrectly, dangerous levels of carbon monoxide can result in a space with inadequate ventilation." Dkt. 27-31 at 3 (note), 5 (note). For instance, in "2022 and 2023, about 60,000 stoves were recalled after [the Consumer Product Safety Commission] discovered they could emit dangerous levels of carbon monoxide." *Id*. at 4.

### D. Benzene

Benzene is a colorless liquid with a petroleum-like odor that evaporates into the air very quickly. Ex. L at 1.The U.S. Department of Health and Human Services, EPA, and the International Agency for Research on Cancer have all classified benzene as carcinogenic. Ex. L at 2; Ex. B to Suppl. Benson Decl. (Dkt. 27-52) at 2; *see also* Ex. Y. "EPA has classified benzene as a known human carcinogen for all routes of exposure." Ex. C at 1. Emissions of benzene that affect the ambient

air are regulated under the federal Clean Air Act as emissions of "hazardous air pollutants." 42 U.S.C. § 7412(a)(6), (b). The World Health Organization states that "there is no safe limit or threshold value for long-term exposure to benzene or its carcinogenic consequences." Dkt. 27-52 at 2.

Short-term inhalation exposure of benzene may cause "drowsiness, dizziness, headaches, as well as eye, skin, and respiratory tract irritation, and, at high levels, unconsciousness." Ex. C at 1. Long-term inhalation exposure "has caused various disorders in the blood," and "[i]ncreased incidence of leukemia (cancer of the tissues that form white blood cells) have been observed in humans occupationally exposed to benzene." *Id.*; *see also* Ex. L at 2. Benzene concentrations emitted during gas stove combustion "can exceed chronic health benchmarks, depending on the amount of gas burned, ventilation, and other factors." Dkt. 27-52 at 2.

### E. Formaldehyde

"Formaldehyde, a colorless, pungent-smelling gas, can cause watery eyes, burning sensations in the eyes and throat, nausea, and difficulty in breathing in some humans exposed at elevated levels (above 0.1 parts per million)." Ex. M at 2; *see also* Ex. D at 2; Ex. A-5 at 1. Formaldehyde is also regulated as a hazardous air pollutant under the federal Clean Air Act. *See* 42 U.S.C. § 7412.

"The Department of Health and Human Services (DHHS) and the International Agency for Research on Cancer (IARC) have characterized formaldehyde as a human carcinogen based on studies of inhalation exposure in humans and laboratory animals." Ex. D at 6; *see also* Ex. Z; Ex. A-5 at 2.

"Human and animal studies indicate that formaldehyde, at certain exposure levels, can be irritating to the upper respiratory tract and eyes with inhalation exposure[.]" Ex. D at 5. As for chronic exposure, some "studies of humans exposed

repeatedly to formaldehyde in workplace air found more cases of nose and throat cancer than expected." Ex. D at 6. "Indoor air often contains higher levels of formaldehyde than outdoor air." *Id*. at 4. Gas stoves are one source of formaldehyde in the home. *See id*. at 2; Ex. M at 1.

## II. Indoor air pollution associated with gas stoves has the potential to contribute to health risks and impacts.

Although there is consensus that indoor air pollutants, including those released from gas stoves, are responsible for harmful effects, there is less consensus about the specific concentrations or periods of exposure necessary to contribute to individual health outcomes. Ex. B at 7. Furthermore, although pollutant levels from any individual source may be small, "most homes have more than one source that contributes to indoor air pollution," which can lead to "a serious risk from the cumulative effects of these sources." *Id*. at 2.

Immediate health effects from indoor air pollutants can include "irritation of the eyes, nose and throat, headaches, dizziness, and fatigue." *Id*. at 6. Other health effects may show up years later after long or repeated exposures. These long-term health effects can be severely debilitating and may include "some respiratory diseases, heart disease and cancer." *Id*. at 7. According to EPA, "[f]urther research is needed to better understand which health effects occur after exposure to the average pollutant concentrations found in homes and which occur from the higher concentrations that occur for short periods of time." *Id*.

Of the common sources of indoor air pollution, "people interact more directly with their stove than with other gas appliances, increasing potential exposure" to the indoor air pollutants released by those stoves. Dkt. 27-51 at 1-2. "The sealed-off kitchen represents a truly worst-case scenario, with no ventilation or air exchange whatsoever. For people in small apartments without a range hood that vents to the

outdoors and few or no windows to open, or in a climate or season that makes opening windows impracticable, this worst-case scenario can be pretty close to reality[.]" Ex. H at 4. In 2022, a pilot study in New York apartment buildings compared $NO_2$ levels inside 10 apartments with natural gas induction stoves and 10 apartments with gas stoves – "[i]n the units with gas ranges, $NO_2$ levels inside the kitchens spiked from a median background of 18 ppb to an average 197 ppb." *Id.*

This result is consistent with numerous studies that have found health risks and health impacts associated with indoor gas stoves. "A 1992 meta-analysis concluded, and a 2013 systematic review and meta-analysis later agreed, that $NO_2$ emissions from gas cooking are associated with an increased risk of asthma and wheeze in children, based on data from observational studies." *Id.* at 1. And a 2022 paper "estimated that 12.7% of all current childhood asthma cases in the United States are attributable to gas stove use." *Id.* A randomized control study is currently underway to further evaluate the connection between gas cooking and childhood asthma. *Id.* at 4.

Beyond asthma and other respiratory diseases, at least one study has "found that gas stove exposure increases the risk of cancer, particularly in homes with high and medium stove usage." Dkt. 27-52 at 9. According to that study, "when considering the lack of ventilation and lack of hood use for typical families in the U.S., the carcinogenic risks to children are almost four to sixteen times higher than the commonly used limit of carcinogenic effect (1E-06) recommended by the WHO for all four types of dwellings." *Id.* The results also suggested "that exposure to benzene attributable to gas stove use in homes raises the risk of leukemia, especially childhood leukemia." *Id.* at 10. As the U.S. Government Accountability Office concluded, "Gas stoves pose certain health and safety risks, due in part to

potentially harmful emissions, including nitrogen dioxide, but there is ongoing debate about the extent of their impact on human health." Dkt. 27-31 at 1; *see also id.* at 2 n.2. This is why the Labeling Requirement and the CDPHE website focus solely on what is known about pollutants from gas stoves, the health effects of those pollutants, and steps people can take to reduce their risks.

### III. AHAM and its members already make statements similar to the label and the website.

Unsurprisingly, given these studies, AHAM and its members already inform consumers about indoor air pollutants that can be released by gas stoves. For example, Bosch, a brand belonging to BSH Home Appliances, an AHAM Member, Compl. (Dkt. 9) ¶ 10, includes a warning in its user manual.[2] Electrolux North America, another AHAM member, *id.*, includes a similar warning.[3] So too does LG, another AHAM member. *See*, AHAM, Member Directory, *available at* https://www.aham.org/AHAM/AuxCurrentMembers.[4]

---

[2] "WARNING: Cooking with gas can release small amounts of certain byproducts, such as Carbon Monoxide, Benzene, Formaldehyde, Nitrogen Oxides (including Nitrogen Dioxide), and Particulate Matter / Soot. . . . Always ensure proper ventilation by using an appropriate ventilation fan or hood, and/or an open window." Ex. W at 9.

[3] "WARNING: The burning of gas cooking fuel can create small amounts of carbon monoxide, benzene, formaldehyde and soot. To minimize exposure to these substances, the burners should be adjusted by a certified installer or authorized servicer to ensure proper combustion. Ensure proper ventilation with an open window or use a ventilation fan or hood when cooking with gas." Ex. V at 13.

[4] "IMPORTANT SAFETY NOTICE: Gas appliances can cause minor exposure to four potentially harmful substances, namely benzene, carbon monoxide, formaldehyde and soot, caused primarily by the imperfect combustion of natural or LP gas. Correctly adjusted burners, indicated by a bluish rather than a yellow flame, will minimize imperfect combustion. Exposure to these substances can be minimized by opening windows or using a ventilation fan or hood." Ex. X at 6.

During the debate over HB25-1161, AHAM sent letters to legislators conceding that its members already warn consumers about cancer risks associated with gas stoves. Exs. D, E to Cassady Decl. (Dkts. 27-15, 27-16) at 2 ("Manufacturers are already required to include a label that states: 'Warning: Cancer and Reproductive Harm' on the gas cooking product."). This label, required as part of California's Proposition 65 labeling regime, also directs consumers to a website maintained by the state of California, www.P65Warnings.ca.gov. *See, e.g.*, Ex. U at 5. As AHAM told the General Assembly, that website includes links that warn consumers that natural gas appliances, including "some ranges," "may emit benzene, carbon monoxide, or formaldehyde when in use. Benzene is present in natural gas, and carbon monoxide and formaldehyde are created when natural gas is burned. Consumers may be exposed to significant amounts of these chemicals, especially if the appliances are not properly vented. Dkts. 27-15, 27-16 at 2.

## IV.    According to AHAM, "Ventilation is Key."

Given the pollutants emitted by gas stoves, and the potential health risks associated with those pollutants, there is unanimous agreement that ventilation is extremely important when using gas stoves.

According to EPA, indoor air pollutants can build up to levels that may affect health if the space is not properly ventilated. *See generally* Ex. B. Therefore, EPA encourages the public to "[i]nstall and use exhaust fans over gas cooking stoves and ranges," Ex. I at 3, and to use "a stove hood with a fan vented to the outdoors . . . during cooking." Ex. B at 21; *see also* Ex. J at 2 (noting that "[v]enting . . . $NO_2$ sources to the outdoors" is among "the most effective measures to reduce exposure").

Researchers agree with EPA. According to one paper, "Evidence-based strategies to decrease exposure to benzene emissions attributable to gas stoves in

the home include switching gas stoves to cleaner electric or induction stoves, using proper ventilation . . . during cooking, and the use of an outdoor-venting kitchen hood with high capture efficiency." Dkt. 27-52 at 10.

Most importantly, AHAM itself agrees that "ventilation is key." Dkts. 27-15, 27-16 at 2. During the debate over HB25-1161, it told the General Assembly that "[i]ndisputably and by far the most important improvement in indoor air quality related to cooking of any type is improved ventilation, primarily, but not exclusively, to deal with particulate matter, especially $PM_{2.5}$, emitted during both gas and electric cooking and originating in the foodstuffs cooked." *Id*. at 3. AHAM also professes to support "further public educational campaigns aimed at building owners, consumers, public housing authorities, and other entities to install and use improved ventilation in residences, including, but not limited to, the proper use and installation of ventilation devices such as exhaust hoods and fans." *Id*.

But, as AHAM concedes, there are "obstacles to the potential effectiveness of ventilation," and "[t]he use of ventilation during cooking is not . . . as extensive as it should be." Ex. T at 9. For one, "most people lack access to high-capture efficiency hoods and may not even own an outdoor-venting hood." Dkt. 27-52 at 10; *see also* Ex. T at 9 ("Outdoor venting may not be a realistic option for all consumers[.]"). And even if consumers have a hood, "the effectiveness and benefit of a vent hood above a cooktop is reduced if the users seldom turn it on while cooking." Dkt. 27-31 at 9. For consumers that rely on windows for ventilation, "it may be impractical to leave windows open all day and night or to open windows in relatively cold or hot climates[.]" Dkt. 27-52 at 10.

For all these reasons, AHAM has time and again explained that "[e]nsuring consumers understand the importance of ventilation, install improved ventilation,

and use it should be an area of emphasis" for policymakers and stakeholders. Ex. T at 10; *see also* Dkt. 27-19 at 4 ("A better use of our collective effort is working to create consumer information that encourages the use of proper ventilation whenever cooking[.]").

## V.    The General Assembly passes HB25-1161.

Against this backdrop, the General Assembly considered and passed legislation designed to increase awareness of the impacts of gas stoves on indoor air quality. The bill, as introduced, was primarily concerned with ventilation. The chief sponsor in the House, Representative Valdez noted that "[t]his bill is a very simple bill that is addressing a very broad issue, and that is, that when we fire gas appliances in our homes, we should ventilate them." Ex. L to Duero Decl. (Dkt. 27-39) at 3. Representative Valdez was clear that the bill was not intended to "mak[e] any determinations about gas stoves," but rather to "prevent people from exposing themselves and their families to some of the most – or potentially most harmful internal household pollutants" by "remind[ing] folks to turn on their vent hood when they're using it." *Id.* at 4, 23.

Although the specific labeling language was amended, testimony by the Senate sponsors confirmed that health and safety concerns motivated the bill, with Senator Kipp noting that the label was intended to make sure "that people understand that there are indoor pollutants created by gas stoves." Ex. A to Duero Decl. (Dkt. 27-28) at 4. Her co-sponsor, Senator Wallace, similarly focused on the "numerous studies that demonstrate the impacts of pollutants emitted by gas stoves, which irritate human airways and can cause or exacerbate respiratory problems in adults, but as well as in our vulnerable populations like our children,"

and characterized the bill as a "commonsense piece of legislation that gives consumers reputable data-driven information about the potential effects." *Id.* at 4-5.

As enacted, HB25-1161 requires retailers to include a label—either on floor models sold in person or online—that reads: "Understand the air quality implication of having an indoor gas stove." § 25-5-1602(1)(a), (3), C.R.S. The label must also link to a website established by CDPHE "with credible, evidence-based information on the health impacts of gas-fueled stoves." § 25-5-1602(4), C.R.S.

## VI.    CDPHE publishes an evidence-based website.

The Division of Environmental Health and Sustainability within CDPHE was tasked with developing the website required by Section 25-5-1602(4), C.R.S. The published website, which is clearly branded with state government logos, contains information about "indoor air quality," "health risks from indoor air pollution associated with gas stoves," and "health impacts from indoor air pollution associated with gas stoves." Ex. O to Cassady Decl. (Dkt. 27-26) at 1-2. It concludes with concrete steps consumers can take "to improve your indoor air quality if you use a gas stove," including recommendations relating to installation, maintenance, and ventilation. *Id.* at 2. Consistent with the statutory requirements, the website includes links to 20 different studies or fact sheets. *Id.* at 2-3. Each statement on the website is supported by information from the cited sources.

| Website Statement | Support |
|---|---|
| There is evidence that particulate matter (PM), nitrogen dioxide, carbon monoxide, benzene, formaldehyde, and methane[5] can be released into indoor air from gas stoves. | Ex. A at 2; Dkt. 27-31 at 2 n.2; Ex. I at 1 |

---

[5] Methane is an air pollutant emitted by gas stoves. Dkt. 27-51 at 1. The remainder of the website, however, and thus the remainder of this pleading, focuses on the other health-affecting pollutants.

| Website Statement | Support |
|---|---|
| According to the U.S. Environmental Protection Agency, indoor air pollutants can build up to levels that may affect people's health if the space is not properly ventilated. | Ex. B at 2 & 3; Ex. S at 5 |
| According to the Centers for Disease Control and Prevention (CDC), U.S. Environmental Protection Agency, and numerous studies, the risk to someone's health depends on:<br>-The amount and type of pollutants in the air,<br>-How long and how often someone breathes polluted air, and<br>-Individual factors like age, health, and lifestyle. | Ex. B at 6-7; Ex. K at 3-4; Ex. N at 2-4; Ex. Q at 2 |
| People with underlying conditions such as asthma, young children, older adults, and people who are more sensitive to pollutants may be more likely to experience health impacts. | Ex. A at 4-5; Ex. B at 2, 6-7, 20-21, 48; Ex. I at 2-3; Dkt. 27-52 at 2-5; Ex. P at 1-2; Ex. R at 1 |
| Health Impacts from Indoor Air Pollution Associated with Gas Stoves<br>-Can include headaches, nausea, eye, nose, or throat irritation, respiratory symptoms, and worsening asthma symptoms | Ex. G at 3; Ex. I at 2 & 3; Dkt. 27-25 at 3; Ex. J at 2; Ex. K at 3-4; Ex. L at 1-2; Ex. M at 2; Ex. N at 2; Ex. P at 1-2; Ex. Q at 2; Ex. R at 1; Ex. S at 1 |
| Breathing high levels of indoor air pollution associated with gas stoves and other sources, breathing it more frequently, or over long periods of time, can increase the risk of developing chronic heart and lung diseases, asthma, impacts to the immune system, and some cancers, such as leukemia, or cancers of the nose and throat. | Ex. I at 1-3; Dkt. 27-25 at 3; Ex. J at 1-2; Ex. K at 3-4; Ex. L at 1-2; Ex. N; Ex. P; Ex. Q at 2 & 3; Ex. R at 1 |

| Website Statement | Support |
|---|---|
| In the U.S. Environmental Protection Agency's "The Inside Story: A Guide to Indoor Air Quality," they recommend:<br>-Properly install and maintain your gas stove according to the manufacturer's specifications.<br>-If you have one, turn on your stove hood while cooking to help remove pollutants from indoor air. Clean and replace the hood filters per the manufacturer's instructions.<br>-Utilize hoods that vent to the outside to dilute indoor air pollution.<br>-Never use a gas stove to heat your home.<br>-When buying a new gas stove, consider a model with pilotless ignition. Pilotless gas stoves use less gas and release fewer pollutants into the air.<br>-Portable air cleaners, such as an air purifier, or furnace/HVAC filters, can help improve indoor air quality.<br>-Decrease pollution exposure by increasing the amount of outdoor air coming into your home - open windows and doors, and turn on ceiling fans. | Ex. B at 3, 4-5, 11-12, 21; Ex. G at 4; Ex. O at 3-4; Ex. S at 3-4 |

## VII.  AHAM claims the Labeling Requirement violates its members' First Amendment rights.

On July 30, 2025, one week before the law took effect, AHAM contacted the Attorney General's office with a request for delay of enforcement. Dkt. 9, ¶ 84. In that same letter, AHAM also alerted the Attorney General of its intent to sue. *Id*. It did so on August 5, 2025, seeking injunctions prohibiting the Attorney General from enforcing the Labeling Requirement, and CDPHE from "publishing on the government website mandated by HB25-1161 any content that would mislead consumers." *Id*. at 35-36.[6] AHAM now seeks preliminary relief prohibiting Defendants from enforcing the law during litigation. Mot. at 30.

---

[6] Defendants Ryan and Lawrence have moved to dismiss the claims against them on the grounds that this relief is unavailable to AHAM and its members. Mot. to Dismiss CDPHE Defs. (Dkt. 31).

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy," which should only be granted if the plaintiff's entitlement to relief is "clear and unequivocal." *State v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021). To obtain an injunction, AHAM must show (1) that it is "substantially likely to succeed on the merits," (2) that it "will suffer an irreparable injury if the injunction is denied," (3) that its threatened injury outweighs the injury the opposing party will suffer," and (4) that the injunction "would not be adverse to the public interest." *Id.* (quotations omitted). Where, as here, the government is the non-moving party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If the Court concludes that AHAM can satisfy the high bar justifying preliminary relief, its injunction must be limited to a prohibition on enforcing the Labeling Requirement against AHAM and its members with standing sue. *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

## ARGUMENT

### I.   AHAM is not substantially likely to succeed on the merits of its constitutional claim.

#### A.  The Labeling Requirement regulates commercial speech.

"The initial question" is whether the Labeling Requirement's "reach is limited principally to commercial speech." *United States v. Wenger*, 427 F.3d 840, 845 (10th Cir. 2005). If so, then it is reviewed under less than strict scrutiny. *Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985).

##### 1.   Communication that occurs only at the point of sale is core commercial speech.

The Labeling Requirement prohibits retailers from selling "a new gas-fueled stove to a potential customer" in Colorado without a label. § 25-5-1602(1)(a), C.R.S.

By its terms, it applies only to speech that "does no more than propose a commercial transaction," *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).

In establishing the contours of commercial speech, courts "draw common sense distinctions" between commercial and non-commercial speech, looking to "the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Wenger*, 427 F.3d 840, 847 (10th Cir. 2005) (quotations omitted). "[S]peech connected with the sale of a good or service – promoting the product or service, explaining it, or giving warnings about it – is commercial." *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir. 2024) (quotations omitted).

The Tenth Circuit has identified three factors that "help illuminate the issue." *Wenger*, 427 F.3d at 847. Here, each factor favors Defendants.

**First**, the speech is "concededly an advertisement." *Id.* Although AHAM does not explicitly concede that point-of-sale speech is an advertisement, it implicitly does so by trying to divert the focus from the label to the state's website. Mot. at 23. But the relevant speech for the purposes of AHAM's First Amendment claim is the speech its members are required to make: the label. And unlike the website, the labels are required on a "specific product" during a "proposed commercial transaction." *Id.* It is "best understood as speech that . . . advertises a product or service for business purposes." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996).

Universally, courts have held that labels disclosing "information in connection with a proposed commercial transaction" qualify as commercial speech. *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009) (calorie labels); *see also R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024) (cigarette packaging); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113

(2d Cir. 2001) (labels on mercury-containing lightbulbs). In perhaps the most analogous example, the Ninth Circuit has repeatedly held that the labels required by California under that state's Proposition 65 regime are commercial speech. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023).

**Second**, the speech "refers to a specific product." *Wenger*, 427 F.3d at 847. Each label refers to "indoor gas stoves" and is affixed to a "display model," § 25-5-1602(1)(b), C.R.S., or "prominently post[ed] on the internet website where the online sale" of an indoor gas stove occurs, § 25-5-1602(3), C.R.S. These labels, displayed "at the point of sale," are "linked to the sales" of gas stoves. *Md. Shall Issue*, 91 F.4th at 248.

**Third**, and finally, the speech is "motivated by an economic interest in selling the product." *Wenger*, 427 F.3d at 847. The question posed by this factor is whether the speaker has a "primarily" economic motivation for communicating with the listener. *Arix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021).

Here, retailers are speaking to consumers for exclusively economic purposes. The entire conversation "relates solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980), and is "readily distinct from governmental attempts to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Md. Shall Issue*, 91 F.4th at 248 (quoting *Zauderer*, 471 U.S. at 651).

### 2.    AHAM cannot compel strict scrutiny by cherry-picking legislative history.

AHAM attempts to avoid the commercial speech doctrine on the grounds that the Labeling Requirement discriminates based on viewpoint and, thus, is subject to strict scrutiny. *See, e.g.*, Mot. at 18. But to do so, it argues that the Labeling Requirement's actual purpose has nothing to do with consumer health. Mot. at 15.

This effort fails for the simple reason that the Labeling Requirement is silent on the topics of climate change and decarbonization.

"The best evidence of [legislative] intent is the text of the statute itself[.]" *Phillips Petrol. Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993). Here, the statute never mentions or even obliquely references decarbonization. That alone is sufficient to reject AHAM's allegation of pretext. The General Assembly consists of 100 different legislators, each of whom may have had their own motivations for supporting or opposing the Labeling Requirement. The only common thread is the text of the statute that supporters voted for and opponents voted against.

Recognizing that the text does not support its claim, AHAM instead presents snippets of the legislative debate around the Labeling Requirement. But AHAM identifies just one legislator who even mentioned climate change during debate on HB25-1161. *See generally* Mot. at 8-11. "[T]he views of a single legislator, even a bill's sponsor, are not controlling." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012). And the Supreme Court has specifically cautioned against using legislative statements as evidence of pretextual purpose. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253-54 (2022).

Moreover, AHAM admits that the legislator, Senator Wallace, only referenced climate change at the very end of her remarks. Mot. at 10. By contrast, Senator Wallace devoted the rest of her remarks to HB25-1161's public health purpose. Dkt. 27-28 at 4:14-5:10. Even if a Senator's individual perspective could override the text, which it cannot, a passing reference to climate change, after a page-worth of

public health discussion, is insufficient to do so.[7] And in any event, that AHAM can only identify a single, passing, reference to climate change, from a single legislator, in the entire legislative record, belies the conclusory allegation that the Labeling Requirement passed with "consistent climate attention." Mot. at 8.

The best evidence that the Labeling Requirement was animated by indoor air quality and public health concerns is the text of the label itself. § 25-5-1602(1)(b), C.R.S. And to the extent that is insufficient to prove the General Assembly's intent, the repeated emphasis on public health and indoor air quality during the legislative debate removes any doubt. *See, e.g.*, Dkt. 27-28 at 4:2-4 ("[R]eally what we are looking at [is] just making sure that people understand that there are indoor pollutants created by gas stoves."); Ex. O to Duero Decl. (Dkt. 27-43) at 2:16 ("[This is] just a consumer health bill.").

### B. The Labeling Requirement is subject to *Zauderer* scrutiny.

As a commercial speech regulation, the Labeling Requirement is not subject to strict scrutiny. And because it compels factual, noncontroversial speech, and does not restrict any speech, it is subject to deferential review under *Zauderer*.

The Supreme Court has routinely distinguished between commercial speech prohibitions, which are subject to intermediate scrutiny, and commercial speech disclosure requirements, which are not. Simply put, "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Zauderer*, 471 U.S. at 651 n.14. This is because a disclosure requirement leaves a regulated entity free to speak, including

---

[7] AHAM repeatedly references the perspectives of people and organizations who testified in support of the Labeling Requirement, *see, e.g.*, Mot. at 10, but the perspectives of those witnesses do not reflect those of any legislator and cannot be used to determine the intent of a particular piece of legislation.

to speak a message counter to the disclosure requirement. *See, e.g.*, *Milavetz, Gallop, & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 250 (noting that compelled disclosure did not "prevent" the regulated entities from "conveying any additional information" alongside the required text); *CTIA – The Wireless Ass'n v. City of Berkley*, 928 F.3d 832, 848 (9th Cir. 2019) ("*CTIA*") (noting that retailer "may add to the compelled disclosure any further statement it sees fit to add").[8]

Accordingly, as a compelled disclosure requirement, the Labeling Requirement is subject to *Zauderer* scrutiny because it is (1) factual, and (2) uncontroversial. *Wenger*, 427 F.3d at 849.

### 1. The information on the label, and the website, is purely factual.

To determine whether a disclosure is factual, courts take a "sentence-by-sentence" approach. *CTIA*, 928 F.3d at 846; *accord Wenger*, 427 F.3d at 849-50. A statement is "factual," for the purposes of *Zauderer*, if it is both (1) "factually accurate" and (2) not so misleading as to render an otherwise factually accurate statement untrue. *Wheat Growers*, 85 F.4th at 1276.

Each statement on the required label and on the website is factually accurate. At minimum, having an indoor gas stove has "implications" for indoor air quality. *See generally supra* at 2-10. And on the website, each statement is supported by facts, with citations to relevant authority. *See supra* at 14-16. There is no hyperbole, and above-all the website echoes AHAM's own mantra: "ventilation is key." AHAM effectively concedes this point—in an entire page disputing that the

---

[8] AHAM agrees that intermediate scrutiny cannot apply because the Labeling Requirement is a "compulsion" of commercial speech, rather than a "restriction." Mot. at 22. The parties' only dispute is whether *Zauderer* or strict scrutiny applies.

website's information is factual, AHAM does not once actually quote the website. *See* Mot. at 25.

Instead, AHAM argues that the mere existence of an unspecified "ongoing, unresolved debate" is sufficient to avoid *Zauderer*. *Id.* But its citations cannot support the weight of that argument. In *National Association of Wheat Growers*, the Prop 65 warning at issue explicitly linked the plaintiff's product to cancer. 85 F.4th at 1278. There, the Court held that such an unambiguous statement was not factual because it did not acknowledge the "scientific debate on that subject." *Id.*

Here, neither the label nor the website makes such a categorical statement. In sharp contrast to the warning at issue in *Wheat Growers*, the label deliberately avoids provocative language. And even on the website, the closest the text comes to the warnings at issue in *Wheat Growers* is the note that "breathing high levels of indoor air pollution associated with gas stoves, breathing it more frequently, or over long periods of time, *can* increase the *risk* of developing chronic heart and lung disease, asthma, impacts to the immune system, and some cancers, such as leukemia, or cancers of the nose and throat." Dkt. 27-26 at 3 (emphasis added). This is a far cry from saying that something is "*known* to the State of California to *cause* cancer." *Wheat Growers*, 85 F.4th at 1263 (emphasis added). Where the latter rejects uncertainty, Colorado's statement acknowledges it.

In fact, to challenge the Labeling Requirement, AHAM and its expert attack language that does not exist. At no point does either the website or the label claim that gas stoves "cause" health impacts. *Contra* Mot. at 4; Benson Decl. (Dkt. 27-3) ¶¶ 60-70. Instead, the website simply states: "there is evidence" that cooking with gas can release various indoor air pollutants, and that those pollutants "can build

up to levels that may affect people's health if the space is not properly ventilated."
Dkt. 27-26 at 2.

> **2.    Because it does not require anyone to wade into a contentious debate, the Labeling Requirement is uncontroversial.**

A statement "is 'uncontroversial' for purposes of *Zauderer* where the truth of
the statement is not subject to good-faith scientific or evidentiary dispute and where
the statement is not an integral part of a live, contentious political or moral debate."
*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024) (citing *Pac.
Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8-9 (1986) and *Nat'l Inst. of
Family & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018) ("*NIFLA*")).

As for the "good-faith dispute" consideration, empirical certainty is not
necessary to justify a product safety disclosure. *See, e.g.*, *CTIA*, 928 F.3d at 846-47
(upholding radiation warning even though radiation "has not been proven
dangerous"). Because the disclosure at issue here is not misleading, as discussed
above, it is not controversial based on scientific dispute. *Id.* at 848.

Nor is the Labeling Requirement controversial "within the meaning of
*NIFLA*" by "forc[ing] retailers to take sides in a heated political controversy." *Id.*
Although AHAM claims that the Labeling Requirement "compels manufacturers
and retailers to . . . express[] the State's views" related to climate change and
decarbonization, Mot. at 19, its claim lacks evidence in the record. To the contrary,
the website assumes that consumers will continue to purchase new gas stoves.

Instead, the Labeling Requirement compels factual disclosures related to the
indoor air quality implications of gas stoves. Proving that this topic is anything but
controversial, AHAM's and its members already voluntarily provide similar
advisements. *See, e.g.*, Exs. U, V, W, and X. *Contra NIFLA*, 585 U.S. at 769

(labeling disclosure requirement controversial where it required health clinics to provide disclosures about services they did not provide "including abortion, anything but an 'uncontroversial' topic").

## C. The Labeling Requirement satisfies constitutional scrutiny.

Under *Zauderer*, purely factual and noncontroversial compelled commercial disclosures are permissible if they are (1) reasonably related to the government's interest, and (2) not unjustified or unduly burdensome *NIFLA*, 585 U.S. at 768–69. Courts have referred to this level of scrutiny as akin to rational basis review, or perhaps slightly elevated from that baseline. *See, e.g.*, *Volokh v. James*, 148 F.4th 71, 85 n.6 (2d Cir. 2025) ("This Court has often described scrutiny under *Zauderer* as 'rational basis' review . . . but some aspects of the *Zauderer* analysis are arguably more stringent."); *Disc. Tobacco*, 674 F.3d at 559 n.8 (describing *Zauderer* as a "rational-basis rule").

The government's interest under *Zauderer* need not be limited to countering deception in advertising. *Contra* Mot. at 24. In *NIFLA*, the Court expressly stated that it did "not question the legality of health and safety warnings long considered permissible," *id*. at 775, and each circuit to have addressed the question has held that *Zauderer* is not limited to reducing deception in advertising. *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019).[9]

---

[9] *See also CTIA*, 928 F.3d at 843 (noting sister circuits "have unanimously concluded that the *Zauderer* exception for compelled speech applies even in circumstances where the disclosure does not protect against deceptive speech"); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22 (D.C. Cir. 2014) ("The language with which *Zauderer* justified its approach . . . sweeps far more broadly than the interest in remedying deception."); *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 518 (6th Cir. 2012) (upholding health warnings on cigarette

Here, Colorado has a substantial interest in protecting public health by ensuring members of the public are educated about issues affecting indoor air quality. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013) (recognizing the "importance" of interest in preserving public health).

### 1. The Labeling Requirement is reasonably related to the state's interest in promoting public health by educating the public about indoor air quality.

"[R]easonably related" is a "deferential" standard. *R J Reynolds*, 96 F.4th at 882. Here, the Labeling Requirement is reasonably related to the state's interest in public health because it increases awareness of the indoor air quality implications of gas stoves, and emphasizes the importance of proper installation, maintenance, and ventilation. *See also id.* at 884 (noting state's "informational interest" in raising consumer awareness).

Because they burn natural gas and propane, indoor gas stoves necessarily release certain indoor air pollutants, including particulate matter, nitrogen dioxide, carbon monoxide, benzene, and formaldehyde. *See supra* at 2-9. Each of these pollutants can contribute to poor indoor air quality.

Recognizing as much, AHAM's own members—and even AHAM itself—emphasize the importance of ventilation when cooking with a gas stove. *See generally* Ex. D to Cassady Decl. (Dkt. 27-15) at 3. And many of AHAM's members include their own warnings that go well beyond the Labeling Requirement. *See, e.g.*, Exs. U, V, W, X. Moreover, all of AHAM's members are already required to include

---

packaging); *N.Y. State Rest. Ass'n*, 556 F.3d at 133 ("*Zauderer*'s holding was broad enough to encompass nonmisleading disclosure requirements."); *Sorrell*, 272 F.3d at 115 (upholding disclosure despite fact it did not "prevent consumer confusion or deception."); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (noting that court found no cases limiting *Zauderer* to deceptive advertising).

Prop 65 warnings on their gas stoves. Dkt. 27-15 at 3; Benezene, Proposition 65, *available at* https://tinyurl.com/4wxzf5h9.

Unfortunately, as AHAM itself concedes, there are "obstacles to the potential effectiveness of ventilation." Ex. T at 9. The Labeling Requirement fills this void by requiring retailers to inform consumers about the indoor air quality implications of cooking with gas stoves, while providing "credible, evidence-based information" so consumers can make informed decisions. § 25-5-1602(4), C.R.S. Not only does the Labeling Requirement address "an actual concrete problem," *contra* Mot. at 20 (quoting *Awad v. Zirix*, 670 F.3d 1111, 1129 (10th Cir. 2012)), but that problem is one AHAM and its members themselves acknowledge.

Importantly, CDPHE's website reflects the state of the scientific literature.[10] Most notably—and contrary to AHAM's repeated implication—it never suggests a causal relationship between gas stoves and any health challenge. *Contra* Mot. at 26. It simply reflects reality already acknowledged by AHAM and its members: indoor gas stoves release byproducts that, if not properly addressed or mitigated, can increase the risk of negative health outcomes.

Finally, AHAM argues that the Labeling Requirement is under-inclusive because it only applies to gas stoves. Mot. at 20-21 (citing *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 801 (2011)). But under-inclusivity is only relevant under strict scrutiny. *Brown*, 564 U.S. at 799-802. By contrast, *Zauderer* itself reinforced that outside of regulations that trigger strict scrutiny, "governments are entitled to attack problems piecemeal." 471 U.S. at 651 n.14.

---

[10] AHAM complains that the website is subject to change, *e.g.*, Mot. at 1, but this is a feature, not a bug. As the scientific consensus changes, so too can the website.

### 2. The Labeling Requirement leaves ample additional channels of communication for AHAM and its members.

In accomplishing this government interest, the Labeling Requirement is not "unduly burdensome." *See CTIA*, 928 F.3d at 848-49. A disclosure requirement is unduly burdensome where it effectively "drown[s] out" the plaintiff's own message. *Id.* at 849 (quoting *Am. Beverage Ass'n*, 916 F.3d at 757). For example, in *American Beverage Association*, the Ninth Circuit rejected a disclosure that would have occupied at least 20% of the plaintiff's advertisement. 916 F.3d at 757. So too in *NIFLA*, where the Supreme Court rejected a disclosure requirement consisting of a 29-word script, required in as many as 13 languages, because such a disclosure would "effectively rule[] out" a "choose life" billboard. 585 U.S. at 778.

Here, the label does not drown out any retailer's speech. And AHAM does not argue otherwise. *See generally* Mot. at 29 (arguing that the Labeling Requirement is "unjustified," but making no argument regarding "unduly burdensome"). Instead, AHAM's primary argument for why the Labeling Requirement fails *Zauderer* is that its public health focus is pretextual. Mot. at 29. But that argument fails for the reasons articulated in Part I.A.2, above.

Moreover, the unique structure of Colorado's regulatory scheme reduces the burdens imposed on AHAM and its members. The Labeling Requirement compels only limited speech from regulated parties. Instead, nearly all of the relevant speech is distributed through a government-hosted and -branded website, which viewers will associate with the government. *Cf. Advance Colo. v. Griswold*, 99 F.4th 1234, 1241 (10th Cir. 2024) ("[T]his statement plainly communicates to voters that the title is drafted by the government and does not represent the proponents' expression."). In most product label cases, the government forces the regulated

party to carry the warning itself. Here, the General Assembly adopted a lighter touch. Although the content on the website may be relevant, this structure significantly reduces the burden on AHAM's members.[11]

AHAM also argues that the Labeling Requirement cannot withstand constitutional scrutiny because "the legislators who advocated for and passed HB25-1161 did not even know what content the website would include." Mot. at 29. But they did know that the website would contain "credible, evidence-based information." § 25-5-1602(4), C.R.S. And to the extent AHAM disputes that the website satisfies this statutory obligation, it may attempt to challenge CDPHE's compliance with that requirement in state court.

Furthermore, AHAM cannot show that its members are unduly burdened by the Labeling Requirement for an even more fundamental reason: many of those members already make far more burdensome advisements, *see, e.g.*, Exs. U, V, W, X, and all those members already include Prop 65 warnings. Dkt. 27-15 at 1. Where, as here, a separate, unchallenged label treads similar ground to Colorado's requirement—and does so in a significantly more burdensome manner—the Labeling Requirement is not unduly burdensome. *Cf. Bishop v. Smith*, 760 F.3d 1070, 1078 (10th Cir. 2014) (holding, in context of standing analysis, that "plaintiffs fail to establish redressability . . . when an unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision").

Finally, *Hedrick v. BSH Home Appliances Corp.* cannot bear the weight AHAM places upon it. No. 2:23-CV-04752-JWH-JDE, 2025 WL 1238363 at *5-6

---

[11] AHAM complains that the website was developed without public comment. *See, e.g.*, Mot. at 11. But it cites no case for why that fact is relevant to a First Amendment analysis. The relevant question is whether AHAM is likely to succeed on its claim that the Labeling Requirement, as it stands today, is unconstitutional.

(C.D. Cal. Apr. 28, 2025). There, the court concluded that the plaintiffs' failure-to-warn claims were preempted by Prop 65. *Id.* at 5. The court further held that the only way the warnings proposed by the plaintiffs would *not* be preempted would be if those warnings went beyond what was required under Prop 65, in which case they would no longer qualify as factual and uncontroversial. *Id.* at *6.

By contrast, the Labeling Requirement does not go beyond what is required under Prop 65—in fact, it treads much more softly. And because the information it discloses is purely factual and uncontroversial, it satisfies the First Amendment.

## II. Because of the Proposition 65 Warnings already on their stoves, AHAM and its members cannot establish irreparable harm.

As AHAM concedes, its members are already required to include Prop 65 warnings on their products. Those labels state: "WARNING: Cancer and Reproductive Harm." Dkt. 27-15 at 1. Because its members are already providing this warning regardless the outcome of this Motion, AHAM cannot establish irreparable harm from the Labeling Requirement.

### CONCLUSION

AHAM's request for a preliminary injunction should be denied.

Respectfully submitted this 30th day of September, 2025.

PHILIP J. WEISER
Attorney General

*s/* Peter G. Baumann

**Michael Landis**
First Assistant Attorney General
Water Quality Unit | Natural Resources &
  Environment Section
**Peter G. Baumann**
Senior Assistant Attorney General
Public Officials Unit | State Services Section
**Katherine M. Field**
Senior Assistant Attorney General
Consumer Fraud Unit | Consumer Protection
  Section
**Pawan Nelson**
Senior Assistant Attorney General
Cross-Unit Litigation Team | Civil Litigation
  & Employment Section
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
Telephone:  720.508.6000
michael.landis@coag.gov
peter.baumann@coag.gov
kate.field@coag.gov
pawan.nelson@coag.gov

*Attorney for Defendants*
*Counsel of Record

## CERTIFICATION REGARDING THE USE OF GENERATIVE AI

Counsel for Defendants certifies that no portion of this filing was drafted by

Artificial Intelligence.